CITY OF CARLSBAD et al. v. SCHULTZ.

(Circuit Court, S. D. New York. February 1, 1897.)

TRADE-MARKS—INFRINGEMENT—"CARLSBAD" MINERAL WATER.

From the discovery of the Carlsbad spring, in 1370, to 1845, none of its waters were exported from the city, the policy of the city being to attract invalids to that place. For 24 years before the first exportation, artificial Carlsbad, made after the anaylsis of the genuine, was sold at many places in Europe, and became very popular. After exportation of the genuine water was begun, the sale of the artificial was continued in Europe, and has continued to the present day, without deception or confusion. Twelve years before the real Carlsbad was first imported to this country, defendant began to make and sell his artificial Carlsbad, built up a large business therein, and continued the same without protest for 34 years. His labels and bottles are radically different from those of complainants, in which the real Carlsbad is now sold here. *Held*, that defendant had a right to continue the sale of his product, but should be enjoined from using "Carlsbad" unless accompanied by some word (as "Artificial") plainly indicating that the water is not the natural spring water.

This is an action to restrain the defendant from using the name "Carlsbad" to designate artificial mineral water manufactured and sold by him, and for profits and damages. The suit was commenced on or about July 20, 1888.

Charles G. Coe, for complainants.

Arthur v. Briesen, for defendant.

COXE, District Judge. This controversy is sui generis. It must be determined upon its own facts. Nothing exactly like it can be found in the law. The record established, indisputably, the following main propositions:

First. From the discovery of the Carlsbad spring, about 1370, until 1845, the waters were not exported. For five centuries the policy of the city was to keep the springs as a close local monopoly for the purpose of attracting invalids. The waters are not used as a beverage. They are medicinal in character and are principally used for bathing and drinking upon the advice of a physician. During the continuance of this unenlightened policy no one in Europe could receive the benefits of these healing waters without a journey to Carlsbad. Not a drop was to be obtained elsewhere.

Second. To relieve this want and supply this demand artificial mineral water was made after the Carlsbad analysis and sold, under that name, for 24 years prior to the first exportation by the city of Carlsbad. This business was carried on in many of the principal cities of Europe upon a large scale. Pump rooms, drinking pavilions and gardens were opened where the artificial waters could be used amid environments similar to those at the natural springs. The business thus inaugurated in 1820 by Dr. Struve has been continued to the present day without molestation by the city of Carlsbad. Indeed, it is not too much to say that it was the success which attended the artificial waters which induced the complainants to begin exporting the natural waters. The enterprise, ability and capital of Struve and his successors made Carlsbad water popular in places where it was never known before. After this market was established by over 20 years of successful use the complainants took advantage of it by sending out the natural waters. There was no fraud or deception on either side. The sale of the natural and artificial water went on, and is still going on, without difficulty or confusion; some preferring the former, others the latter. No one mistook the one for the other. Each has its legitimate place in trade.

Third. The defendant, who is nearly 70 years of age, with the record of a long and honorable business career behind him, commenced manufacturing and selling Carlsbad water in New York in the year 1862. This was 5 years before a single bottle of natural Carlsbad water was seen in this country, 12 years before it was imported here for sale, except in small quantities, and 25 years before the present lessees obtained control of the sale of Carlsbad waters for the United States. In short, the defendant has been engaged in the business for 34 years without protest of any kind until the commencement of this suit. The water is manufactured by him in the most

careful and scientific manner; it is free from the bacteria found in the imported water and is by many preferred to the latter. It is also more expensive. The defendant's bottles and labels are radically different from those of the complainants and there is no evidence that any one was ever cajoled into taking the Schultz water when he wanted the imported water. The label used by the defendant until after this suit was commenced simply contained the word "Carlsbad" with the word "Sprudel" in smaller type, and in parentheses, at the right. The name of the defendant in letters equally prominent with the name Carlsbad also appeared. The label was substantially like the copy represented below, with the word "artificial" omitted. In short, the defendant was the first to occupy this ground. He was the first to make a market for Carlsbad water in the United States. For years he has been engaged in building up a perfectly honest and legitimate business which was paying him a handsome profit when the complainants entered the field.

These being the salient facts, can there be a doubt that the defendant has vested rights which a court of equity is bound to protect? Would it not be inexcusable injustice not only to destroy the defendant's business but compel him to pay over the profits thereof to the complainants? The case is devoid of any element of actual fraud. The defendant has acted in good faith throughout. Starting with the perfectly plain proposition that he had a right to sell artificial Carlsbad water in 1862, it is pertinent to inquire when he lost that right. He was not interfering with the business of the complainants then—they had no business in this country. Schultz's Carlsbad was being sold in New York precisely as Struve's Carlsbad was being sold in many of the cities of Europe. That the defendant may make and sell the water in question is hardly disputed, but it is said that he must not use the name Carlsbad in any form. This is but another way of saying that his business must cease. By what other name could the water possibly be described? How could a customer make his wants known except by using the name Carlsbad? To inform the owner of a California vineyard that he is at liberty to make Champagne and Burgundy wine but must sell it under the name of "grape juice" would not be conferring upon him a highly valuable franchise. If the business be honest those engaged in it have a right to describe the product so that the public will know what it is. What the defendant makes is artificial Carlsbad. This is what a part of the public wants, and there is no reason why they should not have it. Another part prefers the natural Carlsbad. Both parties are engaged in legitimate business. So long as neither interferes with the lawful occupation of the other neither has a right to complain. There is room enough for both.

There can be no pretense that when the defendant used the name Carlsbad alone to designate his water he intended to deceive for the reason, as before stated, that there was no other Carlsbad water in the market at that time. The subsequent introduction of the natural product of the Carlsbad springs into the same market may possibly produce confusion and induce the ignorant and unwary to purchase the defendant's water thinking that it is the imported water. At the

present time the name Carlsbad unexplained does not fairly describe the defendant's water. If, however, he associates with the name Carlsbad a qualifying adjective, such, for instance, as "artificial," and omits the name of E. Ludwig from the larger label, no one can be deceived; not even the "fools and idiots" who, in the judgment of the master of the rolls, were not entitled to extraordinary consideration in such controversies. Manufacturing Co. v. Wilson, 2 Ch. Div. 447.

The complainant has not made a case for an accounting. McLean v. Fleming, 96 U. S. 245.

In order that there may be no misunderstanding upon the settlement of the decree the court has appended a copy of a label which, it is thought, the defendant may use with impunity as truthfully representing the water sold by him.

```
┌──────────────────────────────────┐
│ ARTIFICIAL CARLSBAD              │
│ CARL H. SCHULTZ.                 │
│ 430 To 440  CP⬛M-S  25 & 26 St   │
│ FIRST AVE           NEW YORK.    │
└──────────────────────────────────┘
```

The complainants are entitled to a decree restraining the defendant from using the word "Carlsbad" to designate the water manufactured and sold by him unless accompanied by a word, or words, printed as conspicuously as the word "Carlsbad," plainly indicating that the water is manufactured in this country and is not the product of the Bohemian spring.

It would seem that the complainants are entitled to costs.