LA REPUBLIQUE FRANCAISE et al. v. SCHULTZ.

(Circuit Court, S. D. New York.   May 23, 1899.)

1. TRADE-NAMES—INFRINGEMENT—"VICHY" MINERAL WATER.
    The name "Vichy," as applied to mineral waters, is a geographical name, used generally by the owners of springs near Vichy, in France, to designate the locality of origin, and indicate the general characteristics of their waters.   It is not a trade-mark or trade-name in a legal sense, and a suit by such owners against a defendant for applying the name to artificial waters can only be maintained on the theory of unfair competition.[1]

2. SAME—UNFAIR COMPETITION—LACHES.
    Defendant's testator began the manufacture of artificial "Vichy" water in New York in 1862, advertising and selling the same under the name of "Schultz's Vichy Water," as his own product, and as made from analyses of the natural spring water.   His waters attained a high reputation and a large sale, being considered by many superior to the natural water.   There was no attempt at deception, and his labels were entirely dissimilar from those under which the natural spring water was sold.   Held, that the use of the name "Vichy" in connection with this product did not tend appreciably to confuse the identity of the natural and artificial products, but, even if it did so, it having been begun in good faith, and continued for 30 years without objection on the part of complainants, they could not be heard to assert the right to an injunction.[2]

This was a suit by La Republique Francaise and others against Louise Schultz, executrix, for alleged infringement of rights in a trade-name.

Rowland Cox, for complainants.
Antonio Knawth, for defendant.

WALLACE, Circuit Judge.   Upon the proofs in this case it is clear that the name "Vichy" is not a trade-mark or trade-name of the complainants in the strict legal sense of the term, but is a geographical name, applied by them as well as various other owners of mineral springs at or near Vichy, in the department of Allier, France, to designate the locality of origin, and indicate the general characteristics of the waters.   The bill can only be maintained upon the theory of unfair competition by the defendants and their testator in applying that name to the artificial mineral water manufactured and sold by them in this country.   Canal Co. v. Clark, 13 Wall. 311; Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151; Association v. Piza, 23 Blatchf. 245, 24 Fed. 149; Newman v. Alvord, 51 N. Y. 189; Wotherspoon v. Currie, L. R. 5 H. L. 508–513.

For 50 years or more artificial mineral waters approximating more or less closely in their ingredients and properties to the natural Vichy water have been prepared and sold by the name of "Vichy" by manufacturers in Europe and in this country.   Natural waters lose their original virtues, more or less, when removed from their sources, while artificial waters manufactured under pressure of carbonic acid gas remain intact in all their ingredients.   Mr. Schultz, the testator

[1] As to unfair competition in trade, see note to Scheuer v. Muller, 20 C. C. A. 165, and, supplementary thereto, note to Lare v. Harper, 30 C. C. A. 376.

[2] For laches as a defense in suits for infringement of patents, copyrights, and trade-marks, see note to Taylor v. Spindle Co., 22 C. C. A. 211.

of the defendants, began the manufacture of artificial water in New York City in 1862, and from that time until the present bill was filed —a period of 30 years—continued to make and sell it in large quantities here, advertising it as "Schultz's Vichy Water." His earliest circular to the trade in the record contains this statement: "The mineral waters will be made with the greatest care, and according to the best analyses known, so that they will not differ from the natural springs." As was said of him in a quite similar case by Judge Coxe (City of Carlsbad v. Schultz, 78 Fed. 471): "The case is devoid of any element of actual fraud, and the defendant has acted in good faith throughout." His product acquired a high reputation for its purity, was prescribed extensively by physicians, and was considered by many to be preferable for therapeutical purposes to the natural waters. It became popular as a beverage, being kept by druggists generally to be drawn from fountains or syphon bottles, and sold by the glass. The labels used by Schultz were widely dissimilar from those used with the natural water. It is apparent that he was solicitous to have the water identified with his name as its manufacturer, and that, so far from attempting to palm it off upon the public as the natural Vichy water, he sought to commend it as an artificial water having substantially the ingredients and properties of the natural water, but of greater excellence and purity than the water made by his competitors. If any part of the public bought or used his product supposing it to be the natural Vichy water, they must have been very ignorant or very careless persons.

Assuming that the use of the name "Vichy" in connection with the artificial water made by Schultz may have tended to divert to some extent sales of the water of the complainants, I do not think it tended appreciably to confuse the identity of the two articles.

If it should be assumed, however, that Schultz's use of the name did tend to some extent to confuse the identity of the two articles, the case presents the question whether, after he had used it for nearly 30 years, publicly and notoriously, without any interposition on the part of the complainants, the latter can be heard to assert the right to an injunction. It is impossible that the owners of the natural waters should not have known that wherever they were extensively sold artificial waters were being made and sold extensively by the same name. If the artificial waters had been made and sold as purporting to be the natural waters, there would be less equity in the defense of laches and acquiescence; but they were not. They were made and sold to supply a demand for artificial waters having properties similar to those of the natural water. It is very late to ask the intervention of equity to suppress a course of business which originated innocently, and has been so generally adopted. Equity is indisposed to assist parties who have slept upon their rights, and acquiesced in their appropriation by others for a great length of time. The unexampled delay and acquiescence in the present case, I think, should defeat the action. Manufacturing Co. v. Williams, 37 U. S. App. 109, 15 C. C. A. 520, and 68 Fed. 489; Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 Sup. Ct. 78; McLaughlin v. Railway Co., 21 Fed. 574.

The bill is dismissed, with costs.