PFIZER INC. ET AL. *v.* GOVERNMENT OF INDIA ET AL.

No. 76–749.  Argued November 1, 1977—Decided January 11, 1978

*Samuel W. Murphy, Jr.*, argued the cause for petitioners. With him on the briefs were *Kenneth N. Hart, William J. T. Brown, Peter Dorsey, Allen F. Maulsby, Gordon G. Busdicker, Julian O. von Kalinowski, Joe A. Walters, John H. Morrison, John P. Lynch, Merrell E. Clark, Jr.,* and *Roberts B. Owen.*

*Douglas V. Rigler* argued the cause for respondents. With him on the brief were *Julius Kaplan, James W. Schroeder, Harold C. Petrowitz, Ralph E. Becker, Joseph B. Friedman,* and *James H. Mann.**

MR. JUSTICE STEWART delivered the opinion of the Court.

In this case we are asked to decide whether a foreign nation is entitled to sue in our courts for treble damages under the antitrust laws. The respondents are the Government of India, the Imperial Government of Iran, and the Republic of the Philippines. They brought separate actions in Federal District Courts against the petitioners, six pharmaceutical manufacturing companies. The actions were later consolidated for pretrial purposes in the United States District Court for the District of Minnesota.[1] The complaints alleged that the peti-

---

*Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree, Acting Assistant Attorney General Shenefield, Barry Grossman,* and *Frederic Freilicher* for the United States; and by *Paul C. Sprenger* and *Eric L. Olson* for the Federal Republic of Germany.

[1] Similar actions were also brought by Spain, South Korea, West Germany, Colombia, Kuwait, and the Republic of Vietnam. Vietnam was a party to this case in the Court of Appeals and was named as a respondent

tioners had conspired to restrain and monopolize interstate and foreign trade in the manufacture, distribution, and sale of broad spectrum antibiotics, in violation of §§ 1 and 2 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2. Among the practices the petitioners allegedly engaged in were price fixing, market division, and fraud upon the United States Patent Office.[2] India and Iran each alleged that it was a "sovereign foreign state with whom the United States of America maintains diplomatic relations"; the Philippines alleged that it was a "sovereign and independent government." Each respondent claimed that as a purchaser of antibiotics it had been damaged in its business or property by the alleged antitrust violations and sought treble damages under § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, on its own behalf and on behalf of several classes of foreign purchasers of antibiotics.[3]

---

in the petition for certiorari. Subsequent to the filing of the petition Vietnam's complaint was dismissed by the District Court on the ground that the United States no longer recognized the Government of Vietnam; the dismissal was affirmed by the Court of Appeals. *Republic of Vietnam* v. *Pfizer Inc.*, 556 F. 2d 892 (CA8). Vietnam has not participated as a party in this Court. Some of the other suits have been withdrawn and the rest are pending.

[2] The antibiotic antitrust litigation originated with a proceeding brought by the Federal Trade Commission which resulted in an order requiring petitioners Pfizer and American Cyanamid to grant domestic applicants licenses under their patents for broad spectrum antibiotics. See *Charles Pfizer & Co.* v. *FTC*, 401 F. 2d 574 (CA6). Criminal antitrust proceedings against petitioners Pfizer, American Cyanamid, and Bristol-Myers were eventually dismissed. *United States* v. *Chas. Pfizer & Co.*, 367 F. Supp. 91 (SDNY); see also *United States* v. *Chas. Pfizer & Co.*, 426 F. 2d 32 (CA2), modified, 437 F. 2d 957, aff'd by an equally divided Court, 404 U. S. 548. Most of the large number of civil suits have been settled. See *West Virginia* v. *Chas. Pfizer & Co.*, 314 F. Supp. 710 (SDNY), aff'd, 440 F. 2d 1079 (CA2).

[3] Respondents India and Iran also sued in a *parens patriae* capacity; those claims were dismissed in a separate appeal and are not at issue here. *Pfizer Inc.* v. *Lord*, 522 F. 2d 612, 615–620 (CA8).

The petitioners asserted as an affirmative defense to the complaints that the respondents as foreign nations were not "persons" entitled to sue for treble damages under § 4. In response to pretrial motions [4] the District Court held that the respondents were "persons" and refused to dismiss the actions.[5] The trial court certified the question for appeal pursuant to 28 U. S. C. § 1292 (b).[6] The Court of Appeals for the Eighth Circuit affirmed, 550 F. 2d 396, and adhered to its decision upon rehearing en banc.[7] *Id.*, at 400. We granted certiorari to resolve an important and novel question in the administration of the antitrust laws. 430 U. S. 964.

## I

As the Court of Appeals observed, this case "turns on the interpretation of the statute." 550 F. 2d, at 397. A treble-damages remedy for persons injured by antitrust violations was first provided in § 7 of the Sherman Act, and was re-enacted in 1914 without substantial change as § 4 of the Clayton Act.[8] Section 4 provides:

"[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust

---

[4] Petitioners moved to dismiss the suits brought by India and Iran. The Philippines moved to strike petitioners' affirmative defense.

[5] The District Court relied upon an earlier decision denying a motion to dismiss a related suit brought by the State of Kuwait, see n. 1, *supra*. *In re Antibiotic Antitrust Actions*, 333 F. Supp. 315 (SDNY). An appeal was taken from that decision but was dismissed by stipulation of the parties. Thus, the Court of Appeals' decision in the present case marked the first appellate consideration of the issue.

[6] A petition for mandamus had previously been denied. *Pfizer Inc.* v. *Lord, supra*.

[7] Two judges dissented, believing that Congress, in passing the Sherman and Clayton Acts, did not intend to include foreign sovereigns within the scope of the term "person." 550 F. 2d, at 400. Three judges in the majority also joined a concurring opinion noting the absence of controlling legislative history and urging congressional action. *Id.*, at 399–400.

[8] Section 7 of the Sherman Act was repealed in 1955 as redundant. § 3, 69 Stat. 283; see S. Rep. No. 619, 84th Cong., 1st Sess., 2 (1955).

laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Thus, whether a foreign nation is entitled to sue for treble damages depends upon whether it is a "person" as that word is used in § 4. There is no statutory provision or legislative history that provides a clear answer; it seems apparent that the question was never considered at the time the Sherman and Clayton Acts were enacted.[9]

The Court has previously noted the broad scope of the remedies provided by the antitrust laws. "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S. 219, 236; cf. *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 138–139. And the legislative history of the Sherman Act demonstrates that Congress used the phrase "any person" intending it to have its naturally broad and inclusive meaning. There was no mention in the floor debates of any more restrictive definition. Indeed, during the course of those debates the word "person" was used interchangeably with other terms even

---

[9] The Sherman and Clayton Acts each provide that the word "person" "shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." 15 U. S. C. §§ 7, 12.

It is apparent that this definition is inclusive rather than exclusive, and does not by itself imply that a foreign government, any more than a natural person, falls without its bounds. Cf. *Helvering* v. *Morgan's Inc.,* 293 U. S. 121, 125 n. 1; *United States* v. *New York Telephone Co., ante,* at 169 n. 15.

broader in connotation. For example, Senator Sherman said that the treble-damages remedy was being given to "any party," and Senator Edmunds, one of the principal draftsmen of the final bill,[10] said that it established "the right of anybody to sue who chooses to sue." 21 Cong. Rec. 2569, 3148 (1890).

In light of the law's expansive remedial purpose, the Court has not taken a technical or semantic approach in determining who is a "person" entitled to sue for treble damages. Instead, it has said that "[t]he purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate" the proper scope of the law. *United States* v. *Cooper Corp.*, 312 U. S. 600, 605.

## II

The respondents in this case possess two attributes that could arguably exclude them from the scope of the sweeping phrase "any person." They are foreign, and they are sovereign nations.

## A

As to the first of these attributes, the petitioners argue that, in light of statements made during the debates on the Sherman Act and the general protectionist and chauvinistic attitude evidenced by the same Congress in debating contemporaneous tariff bills, it should be inferred that the Act was intended to protect only American consumers. Yet it is clear that a foreign *corporation* is entitled to sue for treble damages, since the definition of "person" contained in the Sherman and Clayton Acts explicitly includes "corporations and associations existing under or authorized by . . . the laws of any foreign country." See n. 9, *supra.* Moreover, the antitrust laws extend to trade "with foreign nations" as well as among the several States of the Union. 15 U. S. C. §§ 1, 2.[11] Clearly, therefore, Congress

---

[10] See *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 489 n. 10.

[11] THE CHIEF JUSTICE's dissent seems to contend that the Sherman

did not intend to make the treble-damages remedy available only to consumers in our own country.[12]

In addition, the petitioners' argument confuses the ultimate purposes of the antitrust laws with the question of who can invoke their remedies. The fact that Congress' foremost concern in passing the antitrust laws was the protection of Americans does not mean that it intended to deny foreigners a remedy when they are injured by antitrust violations. Treble-damages suits by foreigners who have been victimized by antitrust violations clearly may contribute to the protection of American consumers.

The Court has noted that § 4 has two purposes: to deter violators and deprive them of " 'the fruits of their illegality,' " and "to compensate victims of antitrust violations for their injuries." *Illinois Brick Co.* v. *Illinois,* 431 U. S. 720, 746; *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 485–486; *Perma Life Mufflers, Inc.* v. *International Parts Corp., supra,* at 139. To deny a foreign plaintiff injured by an antitrust violation the right to sue would defeat these purposes. It would permit a price fixer or a monopolist to escape full liability for his illegal actions and would deny

---

Act's reference to commerce with foreign nations was intended only to reach conspiracies affecting goods imported into this country. *Post,* at 323–324. But the scope of congressional power over foreign commerce has never been so limited, and it is established that the antitrust laws apply to. exports as well. See, *e. g., Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593, 599; *United States* v. *Minnesota Mining & Mfg. Co.,* 92 F. Supp. 947 (Mass.).

[12] Moreover, in the Webb-Pomerene Act, ch. 50, 40 Stat. 516, as amended, 15 U. S. C. § 61 *et seq.,* Congress has provided a narrow and carefully limited exception for export activity that would otherwise violate the antitrust laws. See *United States* v. *Concentrated Phosphate Export Assn.,* 393 U. S. 199. A judicial rule excluding all non-Americans as plaintiffs in treble-damages cases would hardly be consistent with the precisely limited exception Congress has established to the general applicability of the antitrust laws to foreign commerce.

compensation to certain of his victims, merely because he happens to deal with foreign customers.

Moreover, an exclusion of all foreign plaintiffs would lessen the deterrent effect of treble damages. The conspiracy alleged by the respondents in this case operated domestically as well as internationally.[13] If foreign plaintiffs were not permitted to seek a remedy for their antitrust injuries, persons doing business both in this country and abroad might be tempted to enter into anticompetitive conspiracies affecting American consumers in the expectation that the illegal profits they could safely extort abroad would offset any liability to plaintiffs at home. If, on the other hand, potential antitrust violators must take into account the full costs of their conduct, American consumers are benefited by the maximum deterrent effect of treble damages upon all potential violators.[14]

## B

The second distinguishing characteristic of these respondents is that they are sovereign nations. The petitioners contend that the word "person" was clearly understood by Congress when it passed the Sherman Act to exclude sovereign governments. The word "person," however, is not a term of art with a fixed meaning wherever it is used, nor was it in 1890 when the Sherman Act was passed.[15] Cf. *Towne* v. *Eisner*, 245 U. S.

---

[13] See n. 2, *supra*.

[14] It has been suggested that depriving foreign plaintiffs of a treble-damages remedy and thus encouraging illegal conspiracies would affect American consumers in other ways as well: by raising worldwide prices and thus contributing to American inflation; by discouraging foreign entrants who might undercut monopoly prices in this country; and by allowing violators to accumulate a "war chest" of monopoly profits to police domestic cartels and defend them from legal attacks. Velvel, Antitrust Suits by Foreign Nations, 25 Cath. U. L. Rev. 1, 7–8 (1975).

[15] The case relied on by petitioners as establishing a general rule, *United States* v. *Fox*, 94 U. S. 315, merely adopted New York's construction of its Statute of Wills, as a matter of state law. *Id.*, at 320. Even in New York

418, 425. Indeed, this Court has expressly noted that use of the word "person" in the Sherman and Clayton Acts did not create a "hard and fast rule of exclusion" of governmental bodies. *United States* v. *Cooper Corp.,* 312 U. S., at 604–605.

On the two previous occasions that the Court has considered whether a sovereign government is a "person" under the antitrust laws, the mechanical rule urged by the petitioners has been rejected.[16] In *United States* v. *Cooper Corp.,* the United States sought to maintain a treble-damages action under § 7 of the Sherman Act for injury to its business or property. The Court considered the question whether the United States was a "person" entitled to sue for treble damages as one to be decided not "by a strict construction of the words of the Act, nor by the application of artificial canons of construction," but by analyzing the language of the statute "in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction." *Id.,* at 605. The Court noted that the Sherman Act provides several

the word "person" did not have a settled meaning. Compare *In re Will of Fox,* 52 N. Y. 530, aff'd *sub nom. United States* v. *Fox, supra,* with *Republic of Honduras* v. *Soto,* 112 N. Y. 310, 19 N. E. 845. In fact, contemporaneous cases generally held that the sovereign was entitled to have the benefit of a statute extending a right to "persons." See, *e. g., Stanley* v. *Schwalby,* 147 U. S. 508, 514–517; *Dollar Savings Bank* v. *United States,* 19 Wall. 227, 239; *Cotton* v. *United States,* 11 How. 229, 231.

Cases construing federal statutes of the same era also indicate that the use of the term "person" did not invariably imply an intent to exclude governmental bodies. See, *e. g., Ohio* v. *Helvering,* 292 U. S. 360 ("person" in §§ 3140 and 3244 of the Revised Statutes of 1878 includes a State); *California* v. *United States,* 320 U. S. 577, 585–586 ("person" in the Shipping Act, 1916, 46 U. S. C. § 801 *et seq.,* includes both a State and a city); *Chattanooga Foundry & Pipe Works* v. *Atlanta,* 203 U. S. 390, 396 ("person" in the Sherman Act includes a city).

[16] Even earlier, in *Chattanooga Foundry, supra,* at 396, the Court held without extended discussion that a city was entitled to sue for treble damages.

separate and distinct remedies: criminal prosecutions, injunctions, and seizure of property by the United States on the one hand, and suits for treble damages "granted to redress private injury" on the other. *Id.*, at 607–608. Statements made during the congressional debates on the Sherman and Clayton Acts provided further evidence that Congress affirmatively intended to exclude the United States from the treble-damages remedy. *Id.*, at 611–612. Thus, the Court found that the United States was not a "person" entitled to bring suit for treble damages.[17]

In *Georgia* v. *Evans*, 316 U. S. 159, decided the very next Term, the question was whether Georgia was entitled to sue for treble damages under § 7 of the Sherman Act. The Court of Appeals, believing that the *Cooper* case controlled, had held that a State, like the Federal Government, was not a "person." This Court reversed, noting that *Cooper* did not hold "that the word 'person,' abstractly considered, could not include a governmental body." 316 U. S., at 161. As in *Cooper,* the Court did not rest its decision upon a bare analysis of the word "person," but relied instead upon the entire statutory context to hold that Georgia was entitled to sue. Unlike the United States, which "had chosen for itself three potent weapons for enforcing the Act," 316 U. S., at 161, a State had been given no other remedies to enforce the prohibitions of the law. To deprive it also of a suit for damages "would deny all redress to a State, when mulcted by a violator of the Sherman Law, merely because it is a State." *Id.,* at 162–163. Although the legislative history of the Sherman Act did not indicate that Congress ever considered whether a State would be entitled to sue, the Court found no reason to believe that Congress had intended to deprive a State of the remedy made available to all other victims of antitrust violations.

---

[17] In 1955 Congress amended the Clayton Act to allow the United States to sue for single damages when it is injured in its business or property. Ch. 283, § 1, 69 Stat. 282, 15 U. S. C. § 15a.

It is clear that in *Georgia* v. *Evans* the Court rejected the proposition that the word "person" as used in the antitrust laws excludes all sovereign states. And the reasoning of that case leads to the conclusion that a foreign nation, like a domestic State, is entitled to pursue the remedy of treble damages when it has been injured in its business or property by antitrust violations. When a foreign nation enters our commercial markets as a purchaser of goods or services, it can be victimized by anticompetitive practices just as surely as a private person or a domestic State. The antitrust laws provide no alternative remedies for foreign nations as they do for the United States.[18] The words of *Georgia* v. *Evans* are thus equally applicable here:

> "We can perceive no reason for believing that Congress wanted to deprive a [foreign nation], as purchaser of commodities shipped in [international] commerce, of the civil remedy of treble damages which is available to other purchasers who suffer through violation of the Act. . . . Nothing in the Act, its history, or its policy, could justify so restrictive a construction of the word 'person' in § 7 . . . . Such a construction would deny all redress to a [foreign nation], when mulcted by a violator of the Sherman Law, merely because it is a [foreign nation]." 316 U. S., at 162–163.

### III

The result we reach does not involve any novel concept of the jurisdiction of the federal courts. This Court has long recognized the rule that a foreign nation is generally entitled to prosecute any civil claim in the courts of the United States

---

[18] While THE CHIEF JUSTICE's dissent says there are "weapons in the arsenals of foreign nations" sufficient to enable them to counter anticompetitive conduct, such as cartels or boycotts, *post,* at 327–328, such a political remedy is hardly available to a foreign nation faced with monopolistic control of the supply of medicines needed for the health and safety of its people.

upon the same basis as a domestic corporation or individual might do. "To deny him this privilege would manifest a want of comity and friendly feeling." *The Sapphire,* 11 Wall. 164, 167; *Monaco* v. *Mississippi,* 292 U. S. 313, 323 n. 2; *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 408–409; see U. S. Const., Art. III, § 2, cl. 1.[19] To allow a foreign sovereign to sue in our courts for treble damages to the same extent as any other person injured by an antitrust violation is thus no more than a specific application of a long-settled general rule. To exclude foreign nations from the protections of our antitrust laws would, on the other hand, create a conspicuous exception to this rule, an exception that could not be justified in the absence of clear legislative intent.

Finally, the result we reach does not require the Judiciary in any way to interfere in sensitive matters of foreign policy.[20] It has long been established that only governments recognized by the United States and at peace with us are entitled to access

---

[19] Congress has explicitly conferred jurisdiction upon the federal courts to entertain such suits:

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

.        .        .        .        .

"(4) a foreign state . . . as plaintiff and citizens of a State or of different States." 28 U. S. C. § 1332 (a) (4) (1976 ed.).

Among the actions foreign sovereign governments were entitled to maintain at the time of the passage of the Sherman and Clayton Acts were suits for common-law business torts, such as unfair competition, similar in general nature to antitrust claims. See *French Republic* v. *Saratoga Vichy Spring Co.,* 191 U. S. 427 (1903); *La Republique Francaise* v. *Schultz,* 94 F. 500 (SDNY 1899).

[20] In a letter that was presented to the Court of Appeals when it reconsidered this case en banc, the Legal Adviser of the Department of State advised "that the Department of State would not anticipate any foreign policy problems if . . . foreign governments [were held to be] 'persons' within the meaning of Clayton Act § 4." A copy of this letter is contained in the Memorandum for the United States as *Amicus Curiae* in opposition to the petition for a writ of certiorari filed in this Court.

to our courts, and that it is within the exclusive power of the Executive Branch to determine which nations are entitled to sue. *Jones* v. *United States,* 137 U. S. 202, 212; *Guaranty Trust Co.* v. *United States,* 304 U. S. 126, 137–138; *Banco Nacional de Cuba* v. *Sabbatino, supra,* at 408–412. Nothing we decide today qualifies this established rule of complete judicial deference to the Executive Branch.[21]

We hold today only that a foreign nation otherwise entitled to sue in our courts is entitled to sue for treble damages under the antitrust laws to the same extent as any other plaintiff. Neither the fact that the respondents are foreign nor the fact that they are sovereign is reason to deny them the remedy of treble damages Congress afforded to "any person" victimized by violations of the antitrust laws.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST join, dissenting.

The Court today holds that foreign nations are entitled to bring treble-damages actions in American courts against American suppliers for alleged violations of the antitrust laws; the Court reaches this extraordinary result by holding that for purposes of § 4 of the Clayton Act, foreign sovereigns are "persons," while conceding paradoxically that the question "was never considered at the time the Sherman and Clayton Acts were enacted." *Ante,* at 312.

I dissent from this undisguised exercise of legislative power, since I find the result plainly at odds not only with the language of the statute but also with its legislative history and precedents of this Court. The resolution of the delicate and

_____

[21] Cf. n. 1, *supra.*

important policy issue of giving more than 150 foreign countries the benefits and remedies enacted to protect American consumers should be left to the Congress and the Executive. Congressional silence over a period of almost a century provides no license for the Court to make this sensitive political decision vastly expanding the scope of the statute Congress enacted.

### A

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). The relevant provisions here are § 1 of the Clayton Act in which the word "person" is defined, and § 4 in which the treble-damages remedy is conferred on those falling within the precisely enumerated categories. Section 1 provides, in relevant part:

"The word 'person' or 'persons' wherever used in this Act shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country."

Section 4 then incorporates this definition by providing:

"That any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Even on the most expansive reading, these two sections provide not the slightest indication that Congress intended to allow foreign nations to sue Americans for treble damages under our antitrust laws. The very fact that foreign sover-

eigns were not included within the definition of "person" despite the explicit reference to corporations and associations existing under the "laws of any foreign country" in the same definition ought to be dispositive under established doctrine governing interpretation of statutes. I therefore see no escape from the conclusion that the omission by Congress of foreign nations was deliberate.

The inclusion of foreign *corporations* within the statutory definition in no sense argues for a different characterization of Congress' intent. At the time of the passage of both the Sherman and Clayton Acts, foreign sovereigns, even when acting in their commercial capacities, were immune from suits in the courts of this country under the doctrine of sovereign immunity. See *The Schooner Exchange* v. *McFaddon,* 7 Cranch 116 (1812); *Ex parte Peru,* 318 U. S. 578 (1943); *Mexico* v. *Huffman,* 324 U. S. 30 (1945). Foreign corporations, of course, had no such immunity. See, *e. g., Shaw* v. *Quincy Mining Co.,* 145 U. S. 444, 453 (1892); *In re Hohorst,* 150 U. S. 653, 662–663 (1893). Given that "person" as used in the Clayton and Sherman Acts refers to both antitrust plaintiffs and defendants, see *United States* v. *Cooper Corp.,* 312 U. S. 600, 606 (1941), the decision of Congress to include foreign corporations while omitting foreign *sovereigns* from the definition most likely reflects this differential susceptibility to suit rather than any intent to benefit foreign consumers or to enlist their help in enforcing our antitrust laws. It would be little short of preposterous to think that Congress in 1890 was concerned about giving such rights to foreign nations, even though it might well decide to do so now.

Respondents' claim that this disparate treatment cannot be justified today when foreign states effectively control many large foreign corporations and when sovereign immunity has been limited by the Foreign Sovereign Immunities Act of 1976, Pub. L. 94–583, 90 Stat. 2891, is not an argument appropriately addressed to or considered by this Court. If

revisions in the statute are required to take into account contemporary circumstances, that task is properly one for Congress particularly in light of the sensitive political nature and foreign policy implications of the question.

The Court's reliance on the references to "foreign nations" in §§ 1 and 2 of the Sherman Act and § 1 of the Clayton Act to support an argument that Congress was specifically concerned with foreign commerce and foreign nations in 1890 when the disputed definition was enacted is similarly unavailing. As a threshold matter, congressional concern with the foreign commerce of the United States does not entail either a desire to protect foreign nations or a willingness to allow them to sue Americans for treble damages in our courts. The Webb-Pomerene Act, ch. 50, 40 Stat. 516, as amended, 15 U. S. C. § 61 *et seq.*, passed within only a few years of the Clayton Act, indicates that such a concern may instead be served at the *expense* of foreign states and consumers.[1]

In any event, the relevant language of §§ 1 and 2 of the Sherman Act, as subsequently incorporated in the Clayton Act, does not support respondents' contention. The reference to "commerce . . . with foreign nations" appeared only in the final draft of the Act as reported by the Senate Judiciary Committee, and replaced language in the numerous earlier drafts of Senator Sherman to the following effect:

> "That all arrangements, contracts, agreements, trusts, or combinations between persons or corporations made

---

[1] The Webb-Pomerene Act exempts certain actions of export associations from the antitrust laws, but the exemption applies only if the association's actions do not restrain trade or affect the price of exported products within the United States and do not restrain the export trade of any domestic competitor of the association. 15 U. S. C. § 62. Although the Act was subsequently regarded as carving out an exemption from the antitrust laws, the legislative history indicates considerable question at the time whether the conduct of exporters meeting the conditions specified in the Act would have violated the antitrust laws even without the putative exemption. See H. R. Rep. No. 50, 65th Cong., 1st Sess., 2 (1917).

with a view or which tend to prevent full and free competition in the production, manufacture, or sale of articles of domestic growth or production, or of the sale of articles *imported* into the United States, . . . are hereby declared to be against public policy, unlawful and void . . . ." 21 Cong. Rec. 2598 (1890) (first draft) (emphasis added).[2]

The focus of this language on protecting *domestic* consumers from anticompetitive practices affecting the *importation* of goods into the United States could not be more clear, nor could the absence of any attention to affording comparable protection for foreign consumers of American exports. The language substituted by the Judiciary Committee—language tracking that appearing in the Commerce Clause—was chosen to mollify the objections of those Senators who felt the proposed statute exceeded Congress' constitutional power to regulate commerce, see, *e. g., id.,* at 2600, 3147 (remarks of Sen. George); *id.,* at 2728, (remarks of Sen. Edmunds); *id.,* at 3149 (remarks of Sen. Reagan); cf. *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 495 (1940); *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 434–435 (1932); that language was not intended to work any substantive change in the focus or scope of the Act. See *United States* v. *Wise,* 370 U. S. 405, 420 (1962) (Harlan, J., concurring). To read this language as evidencing an intent to protect foreign nations or foreign consumers simply belies its lineage.

### B

The legislative history of the treble-damages remedy gives no more support to the result reached by the Court than does the language of the statute. As five of the eight judges of the Court of Appeals concluded—and indeed as the majority here concedes, *ante,* at 312—"Congress, in passing § 4 of the Clayton Act, 15 U. S. C. § 15, gave no consideration *nor did*

---

[2] The equivalent language of subsequent drafts can be found at 21 Cong. Rec. 2598–2600 (1890).

*it have any legislative intent whatsoever, concerning the question of whether foreign governments are 'persons' under the Act."* 550 F. 2d 396, 399 (Ross, J., concurring) (emphasis added). The conversion of this silence in 1890 into an affirmative intent in 1978 is indeed startling.

The failure of Congress even to consider the question of granting treble-damages remedies to foreign nations provides the clearest possible argument for leaving the question to the same political process that gave birth to the Sherman and Clayton Acts. To rely on the absence of any *express* congressional intent to exclude foreign nations from taking advantage of the treble-damages remedy is a remarkable innovation in statutory interpretation. It is a strange way to camouflage the unassailable conclusion that the legislative history offers no affirmative support for the result reached today. Further, as this Court observed just last Term, the legislative history of the treble-damages remedy which does exist "indicate[s] that it was conceived of primarily as a remedy for '[t]he people of the United States as individuals,' especially consumers." *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 486 n. 10 (1977), quoting from 21 Cong. Rec. 1767–1768 (1890) (remarks of Sen. George). What we so recently saw as primarily a remedy for American consumers is now extended to all the nations of the world—a boon Congress might choose to grant but has not done so.

## C

In the absence of any helpful language in the statute or any affirmative legislative history, the Court attempts to base its expansive reading of "person" on Mr. Justice Frankfurter's decision in *Georgia* v. *Evans,* 316 U. S. 159 (1942), granting the State of Georgia and all other *domestic* States the right to sue for treble damages. I fail to see how that result dictates this one.

In *Georgia* v. *Evans,* Mr. Justice Frankfurter concluded that absent the right to sue for treble damages, our States would

be left without any remedy against violators of the antitrust laws. The Court today analogizes the situation of foreign nations to that of the States in *Evans,* and finds the analogy dispositive. When viewed solely in terms of the remedies specifically provided by the antitrust laws, the plight of domestic States and foreign sovereigns may, in this limited respect, be roughly comparable. But the very limited scope of the inquiry in *Evans* precludes consideration of the manifold and patently obvious respects in which foreign nations and our own domestic States differ—cogent differences bearing on the question under consideration here, though obviously not at all on the Court's inquiry in *Evans.*

First, the disparate treatment of foreign and domestic States is a legitimate source of concern only on the assumption that Congress in passing the Sherman Act intended—or even contemplated—that these two categories of political entities were so essentially alike that they were entitled to the same remedies against anticompetitive conduct. As I have already suggested, this assumption derives no support from either the statutory language or anything in the legislative history. Although our own States were also not the expressly intended beneficiaries of the Act, to deny them the treble-damages remedy would, as Mr. Justice Frankfurter perceived, have the unmistakable result of effectively denying surrogate protection to American citizens in whose behalf the State acts and for whose benefit the Sherman Act was enacted. Thus, while the result in *Evans* is a tolerable taking of certain liberties with the literal language of the statute, the congruence of that result with Congress' purpose can scarcely be doubted. This same logic, however, does not even remotely apply to the situation of foreign nations.

Second, it simply is not the case that absent a treble-damages remedy, foreign nations would be denied any effective means of redress against anticompetitive practices by American corporations. Unlike our own States, whose freedom of action in this regard is constrained by the Commerce and Supremacy

Clauses, foreign sovereigns remain free to enact and enforce their own comprehensive antitrust statutes and to impose other more drastic sanctions on offending corporations. One need look no further than the laws of respondents India and the Philippines for evidence that such remedies are possessed by foreign nations. And indeed, *amicus* West Germany has demonstrated that such laws are not mere idle enactments. During the pendency of this action, it notified petitioner Pfizer that a proceeding under German antitrust law was being commenced involving some of the same allegations which are made in the complaint filed by respondents in their treble-damages actions in this country.

While problems of jurisdiction and discovery may render antitrust actions against foreign defendants somewhat more problematic than a suit against a corporation in its own country, the limited experience of the Common Market nations in applying their antitrust laws to foreign corporations suggests that such difficulties are certainly not insoluble and are likely exaggerated. See, *e. g., Europemballage Corp.* v. *E. C. Commission,* 12 Comm. Mkt. L. R. 199 (1973); *Commercial Solvents Corp.* v. *E. C. Commission,* 13 Comm. Mkt. L. R. 309 (1974). And, as the presently existing treaty between the United States and West Germany indicates, *reciprocal* agreements providing for cooperation in antitrust investigations undertaken by foreign nations are an effective means of mitigating the rigors of discovery in foreign jurisdictions. See Agreement Relating to Mutual Cooperation Regarding Restrictive Business Practices, entered into force Sept. 11, 1976. United States—Federal Republic of Germany, [1976] 27 U. S. T. 1956, T. I. A. S. No. 8291.

Third, it takes little imagination to realize the dramatic and very real differences in terms of coercive economic power and political interests which distinguish our own States from foreign sovereigns. The international price fixing, boycotts, and other current anticompetitive practices undertaken by some Middle Eastern nations are illustrative of the weapons

in the arsenals of foreign nations which no domestic State could ever employ. Nor do our domestic States, in any meaningful sense, have the conflicting economic interests or antagonistic ideologies which characterize and enliven the relations among nation states.

Viewed in this light, it is clear that the decision to allow foreign sovereigns to seek treble damages from Americans and to rely on standards of competitive behavior in fixing liability which those very same nations flout in their business relationships with this country is a decision dramatically different from the one Mr. Justice Frankfurter faced in *Evans*. To consider the result reached there as to Georgia determinative of the result here is to substitute a "hard and fast rule of inclusion" for the "hard and fast rule of exclusion" which Justices Frankfurter and Roberts eschewed in *Evans* and *Cooper*, respectively. Only the most mechanical reading of our prior precedent will justify such a result.

Further, the result reached by the Court today confronts us with the anomaly that while the United States Government cannot sue for treble damages under our antitrust laws, other nations are free to engage in the most flagrant kinds of combinations for price fixing, totally at odds with our antitrust concepts, and nevertheless are given the right by the Court to sue American suppliers in American courts for treble damages plus attorneys' fees. It is no answer to say that the United States needs no civil treble-damages remedy since it has reserved for itself the power to pursue criminal remedies against American suppliers for antitrust violations. What that response overlooks is that our criminal antitrust remedies hardly compare with the infinite array of political and commercial weapons available to a foreign nation for use against the United States itself or against American producers and suppliers. This, again, underscores how completely the problem is a matter of policy to be resolved by the political branches without the intrusion of the Judiciary.

## D

Finally, the Court's emphasis on the deterrent effects of treble-damages actions by foreign sovereigns also will not withstand critical scrutiny. We acknowledged in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U. S., at 485–486, that while treble damages do play an important role in deterring wrongdoers, "the treble-damages provision . . . is designed primarily as a remedy." To allow foreign sovereigns who were clearly not the intended beneficiaries of this remedy to nevertheless invoke it reverses this priority of purposes, and does so solely on the basis of this Court's uninformed speculation about some possible beneficial consequences to American consumers of this "maximum deterrent." *Ante,* at 315. In areas of far less political delicacy, we have been unwilling to expand the scope of the right to sue under the antitrust laws without express congressional intent to do so. See, *e. g., Hawaii* v. *Standard Oil Co.,* 405 U. S. 251, 264–265 (1972).[3]

For these reasons I dissent from the Court's intrusion into the legislative sphere.

MR. JUSTICE POWELL, dissenting.

I join THE CHIEF JUSTICE in his dissent, and add a word to emphasize my difficulty with the Court's decision.

The issue is whether the antitrust laws of this country are to be made available for treble-damages suits against American businesses by the governments of other countries. The Court resolves this issue in favor of such governments by construing the word "person" in § 4 of the Clayton Act to include

---

[3] The Court adverts to a letter from the Legal Adviser of the State Department to the Court of Appeals advising that no foreign policy problems were anticipated from a decision holding foreign governments to be persons within the meaning of § 4 of the Clayton Act. The significance of this communication escapes me. Nothing in the Constitution suggests legislative power may be exercised jointly by the courts and the Department of State.

"foreign governments." No one argues seriously that this was the intent of Congress in 1890 when the term "person" was included in the Act. Indeed, the Court acknowledges that this "question was never considered at the time the Sherman and Clayton Acts were enacted." *Ante,* at 312.

Despite this conclusion as to the absence of any congressional consideration, the inviting possibility of treble damages is extended today by judicial action to the sovereign nations of the world.[1] With minor exceptions, the United States recognizes the governments of all of these nations. We may assume that most of them have no equivalent of our antitrust laws and would be unlikely to afford reciprocal opportunities to the United States to sue and recover damages in their courts.

The Court has resolved a major policy question. As the Acting Solicitor General stated in his Memorandum for the United States as *Amicus Curiae,* filed March 23, 1977:

"Whether foreign sovereigns are 'persons' entitled to sue under Section 4 depends largely upon the general policy reflected in the statute, and the general policy of the United States opening its courts to foreign sovereigns."

I had thought it was accepted doctrine that questions of "general policy"—especially with respect to foreign sovereigns and absent explicit legislative authority—are beyond the province of the Judicial Branch. If the statute truly reflected a general policy that dictated the inclusion of foreign sovereigns, the Court might be justified in reaching today's result. In *Georgia* v. *Evans,* 316 U. S. 159 (1942), a clear policy to protect the States of the Union was reflected in the antitrust laws and in the legislative history. The Court could "perceive no reason for believing that Congress wanted to deprive a State, as purchaser of commodities shipped in interstate commerce, of the civil remedy of treble damages which is available

---

[1] At present there are 162 sovereign nations.

to other purchasers who suffer through violation of the Act." *Id.*, at 162.

Unlike the majority, I do not believe the same can be said with respect to foreign sovereigns. See *ante,* at 318. It is not only the absence of specific congressional intent to include them. It is that the predicate for the Court's approach in *Georgia* v. *Evans* is not present in the case before us. The solicitude that we assume Congress has for the welfare of each of the United States, especially when the subject matter of legislation largely has been removed from the competence of the States and has been entrusted to the United States, cannot be assumed with respect to foreign nations. Putting it differently, it was not illogical for the *Evans* Court to include the States within the reach of § 4, but it is a quantum leap to include foreign governments.

A court, without the benefit of legislative hearings that would illuminate the policy considerations if the question were left to Congress, is not competent in my opinion to resolve this question in the best interest of our country. It is regrettable that the Court today finds it necessary to rush to this essentially legislative judgment.[2]

---

[2] The Court quotes a letter to the effect that "the Department of State would not anticipate any *foreign policy problems*" if § 4 were held to embrace suits by foreign governments. *Ante,* at 319 n. 20 (emphasis supplied). But resolution of the issue here depends not only upon foreign policy considerations but also upon considerations relevant to the general welfare of the United States. The latter are quite beyond the concern of the Department of State and should be considered by the Legislative Branch. The international business conducted by American corporations has economic and social ramifications of great importance to our country.