# Constitutionality of Legislative Provision Regarding ABM Treaty

There are serious doubts as to the constitutionality of a provision of a bill stating that the United States shall not be bound by any international agreement entered into by the President that would substantively modify the Antiballistic Missile Treaty with the Soviet Union, including any agreement that would add other countries as signatories or convert that bilateral treaty into a multilateral treaty, unless the agreement is entered pursuant to the President's treaty making power. The provision intrudes on the Executive's exclusive constitutional powers to interpret and execute treaties and to recognize foreign States.

June 26, 1996

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked for our views on section 233(a) of S. 1745, the Department of Defense Authorization Act for Fiscal Year 1997, relating to the Antiballistic ("ABM") Treaty with the former Soviet Union, Treaty on the Limitation of Anti-Ballistic Missile Systems, May 26, 1972, U.S.-U.S.S.R., 23 U.S.T. 3435. Section 233(a) reads:

> (a) Fiscal Year 1997.—During fiscal year 1997, the United States shall not be bound by any international agreement entered into by the President that would substantively modify the ABM Treaty, including any agreement that would add one or more countries as signatories to the treaty or would otherwise convert the treaty from a bilateral treaty to a multilateral treaty, unless the agreement is entered pursuant to the treaty making power of the President under the Constitution.

Section 233(a) raises serious constitutional questions. It is "a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986). It follows that Congress may not hamper or curtail the prerogatives that the Constitution commits exclusively to the executive branch. *See Morrison v. Olson*, 487 U.S. 654, 694 (1988); *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). We have serious doubts about the constitutionality of section 233(a), given that it intrudes on two exclusively Executive prerogatives: the power to interpret and execute treaties, and the power of recognition.

1. The dissolution of the former Soviet Union during the autumn and winter of 1991 required the United States to re-evaluate the bilateral treaties that had

246

existed between the Soviet Union and itself, including the ABM Treaty.[1] Both President Bush and President Clinton operated on the general principle that the treaty rights and obligations of the former Soviet Union had passed to the successor States,[2] unless the terms or the object and purpose of the treaty required a different result. As the Legal Adviser to the State Department during the Bush Administration explained,

> [a]s an operating principle, agreements between the United States and the USSR that were in force at the time of the dissolution of the Soviet Union have been presumed to continue in force with respect to the former republics. What is the legal basis for adopting this position? Except for the Baltic states, which the United States never recognized as part of the Soviet Union, we regarded the emergence of Russia and the other former republics to have stemmed from what was essentially the complete breakup of the Soviet Union. Thus, continuity of treaty relations is supported by our reading of state practice, and by the policy considerations underlying this rule. Perhaps most importantly, however, continuity has been supported by the republics themselves, who affirmed this approach in the Alma Ata Declaration when they guaranteed the "fulfillment of international obligations stemming from the treaties and agreements of the former U.S.S.R."

Edwin D. Williamson and John E. Osborn, *A U.S. Perspective on Treaty Succession and Related Issues in the Wake of the Breakup of the USSR and Yugoslavia,* 33 Va. J. Int'l L. 261, 264–65 (1993).

Congress was well aware that the executive branch was conducting discussions with Russia and several other successor States regarding their rights and obligations under the ABM Treaty, and it twice "urged" the President to pursue such discussions on particular topics. *See* Missile Defense Act of 1991, Pub. L. No. 102–190, § 233(c), 105 Stat. 1321, 1322, *reprinted as note* to 10 U.S.C. § 2431;

---

[1] The former Soviet Government recognized the independence of the Baltic States of Estonia, Latvia, and Lithuania on September 6, 1991. On December 8, 1991, the Republics of Ukraine, Belarus, and Russia formally declared that the Soviet Union had disintegrated, and announced the formation of the Commonwealth of Independent States. In an Address to the Nation on December 25, 1991, President Bush announced that "the United States recognizes and welcomes the emergence of a free, independent, and democratic Russia . . . . Our Embassy in Moscow will remain there as our Embassy to Russia. . . . [T]he United States also recognizes the independence of Ukraine, Armenia, Kazakhstan, Byelarus [sic], and Kyrgyzstan, all States that have made specific commitments to us. We will move quickly to establish diplomatic relations with these States and build new ties to them. . . . [T]he United States also recognizes today as independent States the remaining six former Soviet Republics: Moldova, Turkmenistan, Azerbaijan, Tadjikistan, Georgia, and Uzbekistan. We will establish diplomatic relations with them when we are satisfied that they have made commitments to responsible security policies and democratic principles, as have the other States we recognize today." 2 *Pub. Papers of George Bush* 1654 (1991). *See generally* Paul R. Williams, *The Treaty Obligations of the Successor States of the Former Soviet Union, Yugoslavia, and Czechoslovakia: Do They Continue in Force?,* 23 Denv. J. Int'l L. & Pol'y 1, 3, 24–25 (1994).

[2] References to the "successor States" and the like should not be understood to include the Baltic States, whose conquest by the Soviet Union the United States had refused to recognize.

National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103–160, § 232(c), 107 Stat. 1547, 1593 (1993).

The United States's presumption that the successor States are generally subject to our bilateral treaties with the former Soviet Union is rooted, not only in the United States's past diplomatic practice, but in its understanding of international law.[3] In a May 10, 1995, diplomatic note to the Government of Ukraine, the United States took as its point of departure the "continuity principle" of article 34 of the Vienna Convention on Succession of States in Respect of Treaties, Aug. 22, 1978, 17 I.L.M. 1488, 1509, which reads in relevant part:

> 1. When a part or parts of the territory of a State separate to form one or more States, whether or not the predecessor State continues to exist:
>
> (a) any treaty in force at the date of the succession of States in respect of the entire territory of the predecessor State continues in force in respect of each successor State so formed . . . .

The State Department informs us that the resolution of succession questions after the dissolution of a State has been regarded as a function of the executive branch, and that many executive agreements have been concluded that recognized the succession of new States to the treaty rights and obligations of their predecessors. Furthermore, the State Department advises us, such agreements have not been regarded as treaty amendments or as new treaties requiring Senate advice and consent, but rather as the implementation of existing treaties.

2. It belongs exclusively to the President to interpret and execute treaties. This is a direct corollary of his constitutional responsibility to "take Care" that the laws are faithfully executed. *See* U.S. Const. art. II, § 3; *Goldwater v. Carter*, 444 U.S. 996, 1000 n.1 (1979) (Powell, J., concurring in judgment) (President has "duty to execute" treaty provisions).[4] As the Congressional Research Service has stated, "[t]he executive branch has the primary responsibility for carrying out treaties and ascertaining that other parties fulfill their obligations . . . . The executive branch interprets the requirements of an agreement as it carries out its provisions." *Treaties and Other International Agreements: The Role of the United States Senate*, 103d Cong. at xxiv–xxv (1993). (A Study prepared for the Senate Comm. on Foreign Relations) ("CRS Study").

---

[3] In an older but still pertinent formulation, "[a] state formed by separation from another, whether the personality of the original state still exists or is completely lost by disintegration, succeeds to such treaty burdens of the parent state as are permanent and attached to the territory embraced in the new state." Samuel B. Crandall, *Treaties: Their Making and Enforcement* 434 (1916).

[4] *See also Constitutionality of Proposed Conditions to Senate Consent to the Interim Convention on Conservation of North Pacific Fur Seals*, 10 Op. O.L.C. 12, 14–15, 17 (1986).

The responsibility to interpret and carry out a treaty necessarily includes the power to determine whether, and how far, the treaty remains in force. Again, we cite the Congressional Research Service:

> there is clear judicial recognition that the President may without consulting Congress validly determine the question whether specific treaty provisions have lapsed. The following passage from Justice Lurton's opinion in *Charlton v. Kelly* [229 U.S. 447, 473–76 (1913)] is pertinent: "If the attitude of Italy was, as contended, a violation of the obligation of the treaty, which, in international law, would have justified the United States in denouncing the treaty as no longer obligatory, it did not automatically have that effect. If the United States elected not to declare its abrogation, or come to a rupture, the treaty would remain in force. It was only voidable, not void; and if the United States should prefer, it might waive any breach which in its judgment had occurred and conform to its own obligation as if there had been no such breach. . . . That the political branch of the Government recognizes the treaty obligation as still existing is evidenced by its action in this case. . . . The executive department having thus elected to waive any right to free itself from the obligation to deliver up its own citizens, it is the plain duty of this court to recognize the obligation to surrender the appellant as one imposed by the treaty as the supreme law of the land as affording authority for the warrant of extradition."

*The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 99–16, at 518 (1987). Cases both before and after *Charlton v. Kelly* regard the Executive's views as determining whether and to what extent treaties remain in effect. *See, e.g., Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 253 (1984); *Kolovrat v. Oregon*, 366 U.S. 187, 190 n.4 (1961); *Terlinden v. Ames*, 184 U.S. 270, 286–90 (1902); *Restatement (Third) of the Foreign Relations Law of the United States* § 208, Reporters' Note 5 at 102 (1987). Hence, "[u]nder the law of the United States, the President has the power . . . to elect in a particular case not to suspend or terminate" a treaty. *Id.* § 339(c).

Accordingly, in circumstances in which a State that was a party to a bilateral treaty with the United States has been dissolved, the President must determine, in executing the treaty, whether and how far it remains in force, whether another State or States have succeeded to it, and whether their actions do or do not constitute compliance with its terms. In this instance, the President has determined that the ABM Treaty's obligations should be imputed to the Soviet Union's successor States, including Russia. Congress may not interfere with or direct the President's interpretation and execution of a treaty any more than it may do so

in the case of a statute. Under the proposed legislation, however, Congress appears to be impermissibly interfering in the President's discharge of those responsibilities with respect to the ABM Treaty, thus violating separation of powers principles. *See Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977).

We are aware that the Senate Committee on Foreign Relations, in its Report on the Intermediate Range Nuclear Forces Treaty, maintained that it is a constitutional requirement that "[t]he meaning of a treaty is to be determined in light of what the Senate understands the Treaty to mean when it gives its advice and consent." CRS Study at 95. While we have not been able to review the entire record of the Senate's ratification of the ABM Treaty, we would point out that the treaty was adopted against a background of diplomatic practice by the United States and other nations, and that "where a state divides into its constituent parts, the [diplomatic] practice supports the continuity of existing treaty rights and obligations." [5] Although the dissolution of the Soviet Union was not likely to have been contemplated when the ABM Treaty was ratified, insofar as the Senate may be taken to have had an understanding of what the treaty would mean in such circumstances, that understanding would have been informed by the pattern of diplomatic practice in similar contingencies. Thus, we do not believe that the executive branch's interpretation of the ABM Treaty contradicts the Senate's understanding at the time of ratification.[6]

The Senate Foreign Relations Committee also maintained that it is constitutionally required that "[t]he President may not amend a treaty without the agreement of the parties and the advice and consent of the Senate." CRS Study at 95. Section 233(a) appears to be designed to apply this principle to the ABM Treaty, by deeming "any agreement that would add one or more countries as signatories to the treaty or [that] would otherwise convert the treaty from a bilateral treaty to a multilateral treaty" to constitute a "substantive[ ] modif[ication]" of the treaty.

We would take issue with the proposition that the inclusion of other Soviet successor States along with the United States and Russia as parties to the ABM Treaty would necessarily comprise a substantive modification of that treaty, such as to require Senate advice and consent. We think this in part because of the international law and general diplomatic practice regarding successorship, and in part because, even without the addition of Ukraine, Belarus, Kazakhstan, and possibly other successor States, the ABM Treaty will remain in effect as between

---

[5] Williamson and Osborn, *supra* at 263. For example, treaty obligations were found to be continuous in the cases of the dissolution of the following States: the Greater Colombian Union, which broke up into Colombia, Ecuador, and Venezuela; the union of Norway and Sweden, dissolved in 1905; the separation of Austria and Hungary upon the dissolution of the Austro-Hungarian Empire following World War I; and the separation of Syria from Egypt after the dissolution of the United Arab Republic. *Id.*

[6] Post-ratification interpretations of a treaty by the Senate have no special authority. In *Fourteen Diamond Rings v. United States*, 183 U.S. 176, 180 (1901), the Court, in ignoring a Senate resolution that sought to clarify the customs status of an American territory under a treaty of peace, stated that "[t]he meaning of the treaty cannot be controlled by subsequent explanations of some of those who may have voted to ratify it."

the United States and Russia. Thus, although some changes in the administration of the ABM Treaty may be entailed by the inclusion of other successor States as parties, we do not see why their inclusion must be considered a matter of "substantively modifying," as distinct from "interpreting" and "implementing," the treaty. If the changes do not rise to the level of substantive modifications, then to insist that the proposed executive agreements be submitted to the Senate for its advice and consent would appear to intrude on the President's exclusive authority to interpret and implement treaties.

3. Section 233(a) also raises a serious constitutional question with respect to the President's recognition power.

It is by now firmly established that the power of recognition is exclusively Executive in character. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive.").[7] It is also established that the Executive's recognition authority "includes the power to determine the policy which is to govern the question of recognition." *United States v. Pink*, 315 U.S. 203, 229 (1942). Thus, incident to the recognition of a foreign State, the President may "without the consent of the Senate, . . . determine the public policy of the United States with respect to the [previously unrecognized government's] nationalization decrees," *id.*; or he may unilaterally abrogate a mutual defense treaty with a government that he is derecognizing while recognizing another in its stead, *see Goldwater v. Carter*, 444 U.S. at 1007 (Brennan, J., dissenting). A presidential decision to recognize, or not to recognize, a foreign State or government is binding upon the other organs of the Federal Government: for instance, "[i]t has long been established that only governments recognized by the United States and at peace with us are entitled to access to our courts, and that it is within the exclusive power of the Executive Branch to determine which nations are entitled to sue." *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 319–20 (1978). In sum, the President's recognition authority is not only exclusive, but broad.

The question of determining which States are the "successors" to a State that, like the former Soviet Union, has been completely dissolved, is a matter for the President alone to determine in the exercise of his recognition authority. Moreover, we believe, in determining which States are the successors of a dissolved State, the President may also determine which of the successors are bound by the former

⁷ *See also id.* at 461 & n.20 (White, J., dissenting), *United States v. Belmont*, 301 U.S. 324, 330 (1937), *Goldwater v. Carter*, 444 U.S. at 1007 (Brennan, J., dissenting); *Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994); *Phelps v. Reagan*, 812 F.2d 1293, 1294 (10th Cir. 1987); *Americans United for Separation of Church and State v. Reagan*, 786 F.2d 194, 202 (3d Cir.), *cert. denied*, 479 U.S. 914 (1986); *Restatement (Third) of the Foreign Relations Law of the United States* § 204 ("[T]he President has exclusive authority to recognize or not to recognize a foreign state or government, and to maintain or not to maintain diplomatic relations with a foreign government."); *Section 609 of the FY 1996 Omnibus Appropriations Act*, 20 Op. O.L.C. 189, 193–96 (1996). *Bill to Relocate United States Embassy From Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123, 124–26 (1995); Memorandum for the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Diplomatic Relations with the Vatican* at 4–5 (Jan. 6, 1984); Statement of Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re: Executive Agreements (S. 1251 and S. 632)*, Before the Subcomm. on Separation of Powers, Senate Comm. on the Judiciary at 13 (May 15, 1975).

State's treaty obligations towards the United States, and the extent to which they are so bound. The power to recognize newly emergent States formed from a State's dissolution thus encompasses the power to determine the treaty consequences of their successorship to the parent State.

One of the elements of the recognition of these newly emergent States was and is their succession to applicable Soviet treaties. By purporting to determine that the addition of these successor States to the ABM Treaty would constitute an amendment to that treaty requiring the advice and consent of two-thirds of the Senate, the proposed legislation would act in derogation of the President's recognition power. Because the recognition power is exclusively Presidential, it is doubtful that Congress may take that step.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*
