**In re Jawad Mahmoud HASHIM, Debtor.**

**In re Salwa AL–RUFAIEE, Debtor.**

**In re Jafar HASHIM, Debtor.**

**In re Omar HASHIM, Debtor.**

**Bankruptcy Nos. B–94–9453–PHX–CGC, 94–9454–PHX–CGC, 94–10028 and 94–9455.**

United States Bankruptcy Court, D. Arizona.

Aug. 15, 1995.

636

Donald L. Gaffney, Snell & Wilmer L.L.P., Phoenix, Arizona, for Arab Monetary Fund.

Michael Carmel, Phoenix, Arizona, Special Counsel for Jawad Mahmoud Hashim.

John J. Hebert, Hebert, Schenk & Johnsen, P.C., Phoenix, Arizona, for Maryam Salass and Ali Salass.

Terry A. Dake, Dake & MacKenzie Ltd., Phoenix, Arizona, for Louis A. Movitz, Trustee for Jawad Mahmoud Hashim.

Robert Charles Friese, Steven O. Gasser, Barbara W. Staman, Shartsis, Friese & Ginsburg, San Francisco, California, for Maryam Salass and Ali Salass.

Daniel P. Collins, Leonard, Collins & Kelly, P.C., Phoenix, Arizona, for Trustee David Birdsell.

John R. Clemency, Scott B. Cohen, Streich Lang, P.A., Phoenix, Arizona, for Mark D. Hashimoto, Trustee for Jafar Hashim.

Susan M. Freeman, Lewis and Roca, Phoenix, Arizona, for First National Bank of Chicago.

Alan A. Meda, Alan A. Meda, P.C., Scottsdale, Arizona, for Sadik Hashim.

Robert M. Cook, Yuma, Arizona, for Debtors.

## ORDER RE STANDING AND CAPACITY OF ARAB MONETARY FUND

CHARLES G. CASE, II, Bankruptcy Judge.

### I. INTRODUCTION

During the course of these consolidated bankruptcy cases, the debtors and the Arab Monetary Fund ("AMF") have each raised issues regarding the sovereign immunity, standing and capacity of the AMF and this Court's jurisdiction over the AMF. To bring these issues to resolution, the parties were directed on May 5, 1995 to file certain motions and responses. Accordingly, the following motions, joinders (together the "Motions") and responses were filed [1]:

(1) Jawad Mahmoud Hashim's Motion re: Lack of Arab Monetary Fund Standing, filed May 19, 1995

(2) Joinder of Ali Salass and Maryam Salass in Motion of Jawad Mahmoud Hashim re: Arab Monetary Fund's Lack of Capacity, filed May 19, 1995

(3) Jafar Hashim's Joinder in Jawad Mahmoud Hashim's Motion re: Lack of Arab Monetary Fund Standing, filed May 19, 1995

(4) Omar Hashim's Joinder in Jawad Mahmoud Hashim's Motion re: Lack of Arab Monetary Fund Standing, filed May 19, 1995

(5) Salwa Al–Rufaiee's Joinder in Jawad Mahmoud Hashim's Motion re: Lack of Arab Monetary Fund Standing, filed May 19, 1995

(6) Arab Monetary Fund's Response to Jawad Mahmoud Hashim's Motion re: Lack of Arab Monetary Fund Standing and Joinder of Ali Salass and Maryam Salass in Such Motion, filed May 26, 1995

(7) FNBC'S Statement of Position re AMF Standing, filed May 26, 1995

(8) Jawad Mahmoud Hashim's Reply to Arab Monetary Fund's Response, filed May 30, 1995

(9) Reply of Ali Salass and Maryam Salass in Support of Motion of Jawad Mahmoud Hashim re: Arab Monetary Fund's Lack of Capacity, filed May 31, 1995

In addition to the foregoing filings, the parties submitted additional authority to the Court, both formally and informally, including copies of law review articles, legislative history of certain statutes and portions of the Restatement of Foreign Relations of the United States.

The debtors and Ali Salass and Maryam Salass [2] (the "Salasses") (together the "Movants") contend that the AMF lacks capacity to sue in the United States and therefore cannot participate in any way in the debtors' bankruptcy cases. The AMF contends that it has capacity to participate fully in these bankruptcy cases.

### II. FACTS

#### A. The Debtors

All of the debtors in these cases are related. Dr. Jawad M. Hashim ("Dr. Hashim") is the husband of Salwa Al–Rufaiee and the father of Jafar Hashim and Omar Hashim. Dr. Hashim was the first President and Director General of the AMF, serving in that capacity from 1977 until 1982.

#### B. The formation of the AMF

The AMF is an organization of Arab countries formed by treaty in 1976 and originally comprised of the following twenty-one governments:

Ironically, the AMF contends that the Salasses lack standing to argue against the capacity of the AMF. The Court, however, has already held that the Salasses may participate on this issue and, as noted above, they have filed substantial briefs and authorities.

---

**1.** The AMF waived sovereign immunity for purposes of this proceeding and therefore no motion has been filed on that point.

**2.** Maryam Salass is Jafar Hashim's wife and Ali Salass is Maryam's brother. Ali Salass is a creditor of Dr. Jawad Hashim and Jafar Hashim.

| NAME OF GOVT. | CAPITAL CONTRIBUTION (in Million of Arab Dinars) |
|---|---|
| The Hashemite Kingdom of Jordan | 4 |
| The State of the United Arab Emirates | 15 |
| The State of Bahrain | 4 |
| The Republic of Tunisia | 5 |
| The People's Democratic Republic of Algeria | 38 |
| The Kingdom of Saudi Arabia | 38 |
| The Democratic Republic of the Sudan | 10 |
| The Syrian Arab Republic | 4 |
| The Somali Democratic Republic | 4 |
| The Republic of Iraq | 38 |
| The Sultanate of Oman | 4 |
| The State of Qatar | 10 |
| The State of Kuwait | 25 |
| The Republic of Lebanon | 5 |
| The Libyan Arab Republic | 9.3 |
| The Arab Republic of Egypt | 25 |
| The Kingdom of Morocco | 10 |
| The Islamic Republic of Mauritania | 4 |
| The Yemen Arab Republic | 5 |
| The People's Democratic Republic of Yemen | 4 |
| Palestine | 1.7 |

The rules and regulations of the AMF are contained in the Articles of Agreement of the Arab Monetary Fund (the "AMF Articles")[3], which were originally drafted in Arabic. Among the goals of the AMF, as recited in the AMF Articles, is the establishment of uniform policies governing Arab monetary issues and the development of Arab financial markets. AMF Articles p. 6. Membership in the AMF is open to all Arab states that sign and ratify the AMF Articles. AMF Articles p. 10.

According to the Preamble of the AMF Articles, "[t]he Fund shall have an independent juridical personality and shall have, in particular, the right to own, contract and litigate." AMF Articles p. 5. The assets, papers and records of the AMF enjoy immunity in member states. AMF Articles p. 31. Title VIII of the AMF Articles is entitled

"Litigation." It includes the following provision:

> Article Fifty–Three: Legal action may be brought against the Fund in a court of competent jurisdiction in the State where its Head Office is located. A suit may be filed in courts at the place of dispute provided that the Fund has in such a place, an agency or branch office.

The Head Office of the AMF is located in Abu Dhabi city of the United Arab Emirates. AMF Articles p. 5. The AMF has no office in the United States.

### C. Protocol between AMF and United Arab Emirates

A document entitled Protocol for the Privileges and Immunities of the Arab Monetary Fund, Between the United Arab Emirates (the "U.A.E.") and the Arab Monetary Fund (the "Protocol Agreement"), and dated August 1, 1977, delineates the privileges and immunities that the U.A.E. has granted the AMF, pursuant to the AMF Articles. Dr. Hashim executed the Protocol Agreement as President/Director–General of the AMF in 1977. The AMF Articles were duly confirmed and ratified by the U.A.E. in Federal Decree No. 35 for 1977.

### D. The AMF Claims against the Debtors

The AMF alleges that during his tenure as Director–General, Dr. Hashim fraudulently used and invested AMF funds for his own personal benefit through currency transactions and precious metal investments. In 1982, Dr. Hashim's term as Director–General ended, and he left the U.A.E. and relocated in England, where his wife had been living for some time. There, the AMF brought suit against him, his wife, his two sons, and other unrelated defendants on their various fraud and misappropriation claims (the "English Proceedings"). The AMF's claims were litigated over a six year period in England. Some of his co-defendants[4] claimed in England, as he now claims here, that the AMF,

---

**3.** The AMF Articles provide that it "shall come into force one month after the deposit of the instruments of ratification by States whose total subscriptions are not less than 55 per cent of the authorized capital provided therein."

**4.** Ironically, one of those was First National Bank of Chicago, which in these proceedings has sided with the AMF on the capacity issue.

as a treaty organization of Arab states to which the United Kingdom did not (and could not) belong, lacked legal capacity to sue in the English municipal courts. Eventually, the House of Lords ruled that the AMF had capacity to pursue their claims against the Hashims in the courts of England.

The merits of the AMF's claims against the Hashims were tried and the English chancery court, by Justice Chadwick, ultimately issued in 1993 and 1994 a four-part 606-page opinion granting judgment in favor of the AMF and against Dr. Hashim in the amount of approximately $50,000,000.00 US in principal plus interest in the approximate amount of $83,500,000.00 US (through July, 1994) (the "English Judgment"). Portions of the English Judgment are still on appeal and Dr. Hashim maintains his innocence. .

The Hashims left England, lived in Canada for some period of time and eventually settled here in Arizona. The AMF brought suit against the Hashims in Superior Court in Arizona to enforce the English Judgment, but before that case could progress, the Hashims filed for bankruptcy protection.

The Hashims listed the AMF as a creditor on their statements and schedules and listed the AMF claim as disputed. Counsel for the debtors, as well as Dr. Hashim personally, have represented repeatedly that a primary purpose of the bankruptcy filings was to discharge the AMF debt.

### E. The Executive Orders

The President of the United States has issued Executive Orders prohibiting certain transactions with Libya, Iraq and Iran and limiting interaction between citizens of the United States and citizens of those countries. *See,* Continuation of Libyan Emergency (the "Libya Executive Order"), Pres.Order, Continuation of Libyan Emergency, 59 FR 67119; Continuation of Iraqi Emergency (the "Iraq Executive Order"), Pres.Order, Continuation of Iraqi Emergency, 59 FR 37151 (July 19, 1994); and Presidential Document Prohibiting Certain Transactions With Respect to Iran (the "Iran Executive Order"),

Pres.Order 12959, 60 FR 24757 (May 6, 1995).

The Libya Executive Order provides as follows:

The crisis between the United States and Libya that led to the declaration of a national emergency on January 7, 1986, has not been resolved. The Government of Libya has continued its actions and policies in support of terrorism, despite the calls by the United Nations Security Council.... Such Libyan actions and policies pose a continuing unusual and extraordinary threat to the national security and vital foreign policy interest of the United States. For these reasons, the national emergency declared on January 7, 1986 ... must continue in effect beyond January 7, 1995.

The January 7, 1986 emergency referred to in the Libya Executive Order is former President Reagan's Executive Order, which provides that the import of Libyan goods to the U.S. is prohibited, the export of goods from the U.S. to Libya is prohibited, transportation transactions to or from Libya are prohibited, loans to and from the Libyan government are prohibited, and several other transactions are prohibited. Pres.Order 12543, 51 FR 875 (Jan. 7, 1986).

In addition to the prohibitions described above, the Iraq Executive Order also specifically prohibits "any commitment or transfer, direct or indirect, of funds, or other financial or economic resources by any United States person[5] to the Government of Iraq." Pres.Order 12724, 55 FR 33089 (August 9, 1990), extended by the Iraq Executive Order. The definition of "Government of Iraq" includes "its agencies, instrumentalities and controlled entities." *Id.*

Finally, the Iran Executive Order contains essentially, although not exactly, the same prohibitions as the Libya Executive Order.

### III. DISCUSSION

Against this background, the fundamental issue presented is whether the AMF has

---

5. The term "United States person" is defined broadly enough to include Dr. Hashim regardless of his nationality or immigration status.

legal capacity to bring any cause of action in the United States and, therefore, to participate in these proceedings. The parties in this matter have at times argued (i) that the Court does not have subject matter or personal jurisdiction over the AMF; (ii) that the AMF lacks standing; and (iii) that the AMF lacks capacity. The terms "jurisdiction", "standing" and "capacity" have been used somewhat loosely and have at times been confused. The Court will address each.

## A. Jurisdiction

 The Court notes initially that the AMF has expressly consented, in writing and orally, to the jurisdiction of this Court over it for all purposes related to its claims against the Hashims and these bankruptcy proceedings. Thus there is no question that the Court has personal jurisdiction over the AMF. The AMF argues that the Court has subject matter jurisdiction as well. Because subject matter jurisdiction is not waivable, and neither can parties create it by consent, the Court must consider whether it has subject matter jurisdiction over the AMF in this bankruptcy case.

### 1. Section 1332(a)(4) Jurisdiction

 Article III of the United States Constitution provides:

SECTION 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States . . .—to Controversies to which the United States shall be a Party; . . . to Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

The AMF is a foreign entity. The AMF argues that the Court has jurisdiction under subsection (4) of Section 1332(a) of Title 28 of the United States Code. Section 1332(a) provides that the district courts shall have original jurisdiction of all civil actions . . . between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

Section 1603(a) of Title 28 defines foreign state to include an "agency or instrumentality" of a foreign state. "Agency or instrumentality of a foreign state" means any entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, *and*

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). The AMF argues that it is a foreign state within these definitions because it is an instrumentality or agency of a foreign state.[6] The Court disagrees. The plain language requires that *a* foreign state or political subdivision thereof own a majority of the shares or ownership interests in the AMF for it to qualify as a foreign state. The impact here is quite significant—foreign states are granted certain jurisdictional immunity under § 1603 *et seq.* of Title 28 (the Foreign Sovereign Immunities Act, or "FSIA"). No single foreign state owns a majority of the interests in the AMF therefore it cannot qualify as a foreign state under Title 28, and Section 1332(a)(4) Jurisdiction does not apply.

Contrary to this conclusion, a few courts outside this Circuit have held that foreign governments could form an entity and pool their ownership interests to reach the re-

---

6. Of course, the AMF did not commence these proceedings; the petitions were filed voluntarily by the Debtors. Since the filing, however, the AMF is treading on dangerous ground with this assertion. Of which of its 21 members is it an agent or instrumentality? Presumably, it would not wish to be considered an agent or instrumentality of Iraq (subject to the Iraq Executive Order) or Libya (subject to the Libyan Executive Order). Such a conclusion could result in a prohibition on the collection of any judgment obtained in this Court by the AMF.

quired majority ownership standard and be included in the definition of an agent or instrumentality of a foreign state. *See Mangattu v. M/V Ibn Hayyan,* 35 F.3d 205 (5th Cir.1994) (foreign shipping corporation); *LeDonne v. Gulf Air, Inc.,* 700 F.Supp. 1400 (E.D.Va.1988) (foreign airline). In *Mangattu,* a foreign corporation was formed under the laws of Kuwait and owned 100% by six foreign sovereigns: Saudi Arabia, Kuwait, Zatar, United Arab Emirates, and Iraq. The *Mangattu* court held that the six sovereigns could pool their interests to reach the majority ownership provision required under Section 1603(b) of Title 28.

The Salasses explain at length the error of the *Mangattu* decision, and this Court is persuaded that they are correct. *See Broadbent v. Organization of American States,* 481 F.Supp. 907, 908 (D.D.C.Cir.1978) ("international organizations, ... are creatures of treaty and by virtue of treaty stand in a different position with respect to the issue of immunity than sovereign nations."); *International Ass'n of Machinists v. OPEC,* 477 F.Supp. 553 (C.D.Cal.1979) (finding that OPEC is not a foreign state under the FSIA).

The International Organizations Immunities Act ("IOIA") provides certain privileges and immunities for international organizations designated thereunder. 22 U.S.C. § 288a. The IOIA is discussed in great detail below. For purposes of this discussion regarding the pooling of interests by foreign sovereigns to qualify under the FSIA, however, the IOIA is relevant. If multiple foreign governments could pool their ownership interests to become, by definition, an agent or instrumentality of a foreign state, and thereby obtain certain immunities, then portions of the IOIA would be rendered somewhat meaningless.

Notwithstanding lack of Section 1332(a)(4) jurisdiction, there is another basis of jurisdiction which succeeds.

## 2. Section 1334(b) Jurisdiction

■ Section 1334(b) of Title 28 provides: (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

Regarding the scope of this section, the Ninth Circuit has adopted the following test set forth by the Third Circuit in *In re Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir. 1984):

> The usual test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.* [citations omitted]. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*In re Fietz,* 852 F.2d 455, 457 (9th Cir.1988) (emphasis in original).

■ Debtors argued in this case that the Court has jurisdiction to discharge in this Country the "claim" of the AMF, whether otherwise enforceable by the AMF or not. Concurrently, debtors argued that the Court does not have subject matter jurisdiction over the AMF. This is somewhat contradictory, although not entirely. In *Klinghoffer v. S.N.C. Achille Lauro Ed. Altri–Gestione Motonave, et al.,* 937 F.2d 44 (2nd Cir.1991), the Second Circuit examined the defendant PLO's arguments that it was either a foreign state or, if not, it lacked legal capacity to be sued because the United States had not accorded it formal diplomatic recognition. The Second Circuit held that the PLO was not a foreign state *and* that it had legal capacity to *be sued. Id.* at 47–48. In so holding, however the Second Circuit explained:

> While unrecognized regimes are generally precluded from appearing *as plaintiffs* in an official capacity without the Executive Branch's consent, [citations omitted] there is not bar to suit where an unrecognized regime is brought into court *as a defendant.*

*Id.* at 48 (emphasis added). Thus, an unrecognized political regime could be subject to suit in the United States as a defendant, but lack legal capacity to initiate suit as a plaintiff.

The AMF holds a $135 million judgment against debtors. It is listed as a disputed creditor in these cases. Indeed, counsel for debtors and debtors themselves have repeatedly stated that the central purpose in filing their bankruptcies was to discharge the AMF debt. To this Court, either the AMF has a claim subject to a discharge order if entered, or it has no claim, no right to participate in these proceedings, and no interest that will be subject to a discharge order.

This Court finds that under the standard adopted in the Ninth Circuit, the claim of the AMF is related to the debtors' proceedings within the meaning of Section 1334(b) and the Court has jurisdiction over the AMF and its claims.[7]

### B. Standing

■ Generally, creditors of a debtor have standing to participate in a debtor's bankruptcy. *See, e.g.,* Section 1109 [8] ("A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter [11]."); Section 343 (At the 341 hearing, "[c]reditors, any indenture trustee, any trustee or examiner in the case ... may examine the debtor."); Section 501(a) ("A creditor or an indenture trustee may file a proof of claim."); Section 502 (Creditors can object to proofs of claim.)

■ The Movants contend that, because of its status as a treaty organization of sovereign states, the AMF cannot be a creditor of these debtors. Therefore, they argue, the AMF does not have standing to participate in this case. Debtors take this view even though they admittedly seek a discharge that will preclude the AMF from further efforts

(at least in the United States) to collect the English Judgment. This argument does not withstand scrutiny.

The definition of a creditor in Section 101(10) of the Bankruptcy Code includes an:

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

Accordingly, the issue is whether the AMF is first an "entity" and second, if so, whether the AMF has a "claim" against the debtors. Section 101(15) provides:

(15) "entity" includes person, estate, trust, governmental unit, and United States trustee;

This definition is not exclusive. The debtors argue that the AMF is not an entity because it does not fit within the inclusive list in Section 101(15). The definition of person in Section 101(41) includes corporations, and the definition of corporation in Section 101(9) includes "unincorporated company or association." The AMF contends that it is a U.A.E. corporation and the debtors argue that it is not. This is addressed in further detail below.

The debtors state that the AMF "is a creature of a treaty amongst approximately twenty (20) Arab governments...." Although "creature of a treaty" is not in the enumerated organizations listed in the definition of entity, this Court finds the AMF, even as a "creature," is at the very least still an "entity," regardless of whether it is a "corporation" and therefore a "person."

Thus, whether the AMF is a creditor now turns on whether it holds a claim.

Section 101(5) defines a claim as a:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives

---

7. The AMF also relies upon Section 1332(a)(2) for its subject matter jurisdictional claims. In light of the existence of jurisdiction under Section 1334(b), discussion of this section is not necessary.

8. Except as otherwise specified herein, all references to Sections are to sections of Title 11 of the United States Code.

rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

■ As noted above, the AMF holds a judgment from the Chancery Court in England in the approximate total amount of $135 million. Clearly this judgment is, in the strictest sense of the words, at least a right to payment, whether or not it remains disputed by debtors.

■ The Movants contend, however, that the phrase "right to payment" means an *enforceable* obligation, citing *Penn. Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 559, 110 S.Ct. 2126, 2131, 109 L.Ed.2d 588 (1990), and *In re Irizarry*, 171 B.R. 874, 878 (9th Cir. BAP1994). Simply put, debtors and Salasses urge the Court to read the word "enforceable" into the Code definition of claim, and thereafter to determine the AMF claim to be non-enforceable because of lack of capacity to sue in the United States.

Several courts have denied creditors the ability to bring Section 727 (denial of discharge) and Section 523 (dischargeability of a claim) complaints because the creditors did not have enforceable claims. *See e.g., Irizarry, supra; In re Dunn,* 50 B.R. 664 (Bankr. W.D.N.Y.1985). *Dunn* involved a conversion action that was barred by the statute of limitations under New York law. The *Dunn* court held that the creditor could not bring a Section 523 action for dischargeability of the claim because the claim was barred. While this Court agrees that claims barred by statutes of limitation cannot be the basis of a Section 523 or 727 action, the Court has found, and the parties have cited, no cases where a Court had denied a party *standing* to participate in a bankruptcy case because the party may lack *capacity* to sue on that claim in a United States court.

Section 502(b)(1) is instructive, but inconclusive, on this point. It provides that a claim may be disallowed if it "unenforceable against the debtor ... under ... applicable law." There has been no suggestion that the judgment is not enforceable under English law; the argument is that "applicable law" must necessarily be American law. This case is different from *Dunn*, however, since the defense goes not to the nature of the claim but to the nature of the claimant. Presumably, if the AMF were to assign its claim to a third party who clearly has capacity, any infirmities of the AMF in that regard would be cured whereas if the claimant in *Dunn* assigned its time-barred claim to a third party, it would be still be time barred.

On balance, the Court concludes that under the plain language of the Bankruptcy Code the AMF is a creditor. As a creditor, it has standing under the Bankruptcy Code to participate in the bankruptcy proceedings.

Despite the standing of the AMF and the Court's jurisdiction over the claims of the AMF, there is still the allegation by the Movants that there is an overriding Congressional policy *to deny* access to AMF because it lacks legal capacity in this Country. Examination of this issue follows.

## C. Capacity

### 1. The term

■ "Capacity has been defined as a party's personal right to come into court, and should not be confused with he question of whether a party has an enforceable right or interest or is the real party in interest." Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1559, p. 441. Capacity should not be confused with the concept of "standing" or subject matter jurisdiction. *See id.* at § 1542, pp. 327–330, 442–443. Thus, the question now posed is not whether the Court has power to resolve the dispute between Debtors and the AMF (i.e., jurisdiction) or whether the AMF has a stake in the outcome (i.e., standing), but rather whether the AMF has the legal authority to assert its claim in the courts (i.e., capacity). The Movants say it does not because Congress has barred the AMF from access to the courts by passage of the IOIA.

### 2. IOIA

■ The IOIA was enacted by Congress in 1945. Section 288a of the IOIA provides as follows:

International organizations shall enjoy the status, immunities, exemptions, and privileges set forth in this section, as follows:

(a) International organizations shall, to the extent consistent with the instrument creating them, possess the capacity—

(i) to contract;

(ii) to acquire and dispose of real and personal property;

***(iii) to institute legal proceedings.***

(b) International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.

(c) Property and assets of international organizations, wherever located and by whomsoever held, shall be immune from search, unless such immunity be expressly waived, and from confiscation. The archives of international organizations shall be inviolable.

(d) Insofar as concerns customs duties and internal-revenue taxes imposed upon or by reason of importation and the procedures in connection therewith; the registration of foreign agents; and the treatment of official communication, the privileges, exemptions, and immunities to which international organizations shall be entitled shall be those accorded under similar circumstances to foreign governments.

22 U.S.C. § 288a (emphasis added) (hereinafter "Section 288a").

The Movants argue that the IOIA deprives all international organizations **other than those described in the IOIA** of legal capacity. Thus, it is the Movants' position that *only* international organizations specifically covered by the IOIA have legal capacity to sue in this Country—all others do not. The movants have cited no case that specifically reads the IOIA in this restrictive way and the Court is aware of none. For its part, the

AMF contends that (i) the IOIA is *not* an exclusive source of legal capacity, (ii) the AMF has capacity as a creditor in this bankruptcy case, and (iii) the AMF has legal capacity as a corporate or similar entity under U.A.E. law.

Legislative history reveals that a primary motivation behind the IOIA was to provide legislation to grant privileges and immunities to the United Nations, and pave the road to allow the United Nations to place its headquarters in this country. 79th Congress, 1st Session House of Representatives, Report No. 1203, p. 2. At the time, the location of the headquarters in New York City appeared probable and the State Department had advised that the failure to clarify that governmental "privileges and immunities" would extend to the new organization could "embarrass" the United States in the final meetings on the headquarters issue. *Id.*

Further, the December 18, 1945 Senate Report provides:

The basic purpose of this title [IOIA] is to confer upon international organizations, and officers and employees thereof, privileges and immunities *of a governmental nature.*

79th Congress, 1st Session, Senate, Report No. 861, p. 1. (emphasis added). The November 12, 1945 Report from the House of Representatives provides that prior to the enactment of IOIA there existed "no law of the United States whereby this country [could] extend privileges *of a governmental character* with respect to international organizations or their officials in this Country." 79th Congress, 1st Session House of Representatives, Report No. 1203, p. 2 (emphasis added). Legislative history further reveals that since the enactment of the IOIA, the intended beneficiaries of the legislation were international organizations in which the United States is a member. *Id.* Notwithstanding this Congressional intent, a few international organizations in which the United States is not a member have been specially designated under the IOIA and added to the list of organizations that enjoy the benefits of the IOIA. These few are the exception and not the rule.

■ As recently as 1988, legislative history reveals that the IOIA "provides the legal framework within which international organizations operate in the United States." 100th Congress, Second Session, May 17, 1988 Congressional Record—House p. 3345. The AMF does not "operate" in the United States. It has no offices in the United States. In the same Congressional Record is noted the State Department's reluctance to add to the IOIA an organization in which the United States is not a member. *Id.* The Record provides:

> I would note, however, the reservation of the Department of State that this action should not be seen as creating a precedent. The State Department has advised that it is not customary for the united States to grant immunity to organizations of which the United States is not a member.

*Id.* (emphasis added). In this light, it is clear that the IOIA was not and is not intended to be applicable to organizations such as the AMF.

Diplomatic immunity and similar matters are privileges "of a governmental character," but legal capacity to sue is certainly not unique to governmental entities. The legislative history seems to suggest that although legal capacity is granted in the IOIA, and although the IOIA clearly and unequivocally opened the doors of the federal courts of the United States to designated international organizations, the larger purpose of the IOIA was to designate those organizations entitled to governmental-type privileges and immunities.

The language of the IOIA is not as restrictive as suggested by the Movants. Indeed, the right to sue and be sued is only one of a bundle of privileges and immunities granted to organizations falling within its definition. There is nothing in the statute itself that supports the conclusion that it is the exclusive means of access to the United States Courts; rather, its structure suggests that its purpose is to establish, without equivocation, that international organizations that do fall within its definition are entitled to the entire bundle of privileges and immunities without having to resort to some other source of law. To suggest, as do the Mov-

ants, that none of the privileges, let alone the immunities, listed in the IOIA are available to nonqualifying international organizations because all of them are not is to read language into the statute that simply is not there.

■ Therefore, since the IOIA neither provides the AMF with capacity to sue or be sued, nor deprives it of such capacity, the next inquiry is whether there is another source of law which does.

### 3. The Restatement of Foreign Relations Law 3rd

■. The Restatement of the Law the Foreign Relations Law of the United States, (1986) (hereinafter "Restatement of Foreign Relations" or "Restatement") provides some guidance on the capacity question.

The AMF fits the restatement definition of an international organization, which provides:

> As used in this Restatement, "international organization" means an organization that is created by an international agreement and has a membership consisting entirely or principally of states.

Restatement § 221. The AMF is comprised of the governments of twenty Arab states and Palestine. It is an international organization under the above definition. The question is whether an international organization that is not a designated international organization under the IOIA can nonetheless have the capacity to sue in the United States.

■ The Restatement provides:

> § 223. International Organizations: Capacities, Rights, and Duties
> Subject to the international agreement creating it, an international organization has
> (a) status as a legal person, with capacity to own, acquire, and transfer property, to make contracts, to enter into international agreements with states and other international organizations, and to pursue legal remedies; and
> (b) rights and duties created by international law or agreement.

Restatement of Foreign Relations, § 223 (p. 140). Under this section, the AMF would

appear to have capacity to pursue legal remedies under international law. However, Comment e to Section 223 further provides as follows:

e. International organizations and nonmembers. As international organization with a substantial membership is a person in international law even in relation to states not members of the organization. However, a state does not have to recognize the legal personality of an organization of which it is not a member, which has few members, or which is regional in scope in a region to which the state does not belong. As to the capacities and privileges and immunities to be accorded an organization by non-members, see § 467, Comment f.

The United States is not a member of the AMF, nor would it be permitted under the AMF Articles to become a member of the AMF. In addition, the AMF is regional in scope, limited to Arab countries, in a region to which the United States does not belong. Accordingly, under the above comment, the United States "does not have to recognize" the legal personality of the AMF.

The inquiry into the Restatement of Foreign Relations, however, does not end here. The Introductory Note to Subchapter B, Immunities of International Organizations, Pt. IV, Jurisdiction and Judgments, Restatement of Foreign Relations provides:

International organizations have achieved independent legal personality under international law largely since the Second World War.... Earlier, they were seen largely as 'unincorporated' associations of individual states and sometimes claimed the immunities of one or all of their member states.[9]

Section 467 of the Restatement provides:
§ 467. Privileges and Immunities of International Organizations

(1) ...

(2) Under the law of the United States, international organizations are entitled to the privileges and immunities provided by international agreements to which the United States is a party, and organizations designated by the President under the International Organizations Immunities Act are entitled to the privileges and immunities in that Act.

Comment a to Section 467 further provides:
The United Nations and its Specialized Agencies, *and regional and other major organizations*, have international legal personality vis-a-vis all states including nonmember states (see § 223, Comment e), and these organizations are commonly deemed to enjoy privileges and immunities in relation to nonmember states *as a matter of customary law*. Other international organizations enjoy specified privileges and immunities by international agreement and therefore only in relation to parties to those agreements, or under state legislation such as that of the United States (the International Organizations Immunities Act). See Comment f....

(emphasis added).

Comment f to Section 467 provides, in pertinent part:
Organizations of which the United States is not a member, and that have not been designated under the International Organizations Immunities Act, do not enjoy privileges and immunities in the United States except insofar as a particular organization might be entitled to them *by customary law*. See Comment a.

(emphasis added).

Thus, we are left with two questions: what is applicable "customary law" and does it grant the AMF legal capacity?

No party to these proceedings argues that the AMF is entitled to all of the privileges and immunities set forth in the IOIA; quite the contrary, the AMF argues only that it has legal capacity—the right to participate in legal proceedings. This is a far narrower issuer than whether the AMF is entitled to governmental privileges and immunities. A Harvard Law Review Note from 1958 considered this question. *The Status of Interna-*

9. This is some support for the proposition that the AMF, even if not a U.A.E. corporation, would qualify as a corporation under the Bankruptcy Code as an unincorporated association. See § 101(9)(A)(iv) of the Bankruptcy Code.

*tional Organizations Under the Law of the United States*, 71 Harv.L.Rev. 1300 (1958) (the "1958 Article"). In the 1958 Article, the writer analyzed the IOIA, commenting initially that "[t]he period following World War II has been marked by a proliferation of world-wide and regional associations of nations.... The expanding number of international organizations, many claiming identities as independent legal entities separate from their constituent states, has created novel problems of legal status under both international law and the domestic law of the United States." *Id.* at p. 1300.

▮▮▮ Specifically analyzing whether the IOIA precludes legal capacity for international organizations that are not designated thereunder, the writer of the 1958 Article reasoned as follows:

If an international organization is not eligible for designation under the act [IOIA] because the United States does not participate in it, and there is no treaty with the organization granting it capacity, it is arguable that it can have no legal capacity in the United States. The Immunities Act [IOIA] might be interpreted as evincing a congressional purpose to exclude all such organizations from the benefits that designated organizations would receive. However, since there is not clear language in the statute to that effect, and the legislative history does not dictate this result, such a negative implication does not seem justified. But even if the Immunities Act does not deny capacity to international organizations in which the United States does not participate, it may still be argued that there is no basis in the common law for creating such status since such organizations do not correspond precisely to any legal entity previously accorded capacity under domestic law. Since recognized foreign states have legal personality in the United States, with capacity to sue and be sued, contract, and hold property, it might be contended that an organization composed wholly of recognized states should have such capacity.

. . . . .

[O]rganizations which are given capacity in their member countries may be enough like foreign corporations to justify the application of principles of comity which accord a corporation created in one jurisdiction capacity in other jurisdictions. Even if international organizations are not regarded as foreign corporations, they may be accorded capacity by analogy to the recognition of some unincorporated associations as legal personalities in the United States.

. . . . .

Capacity could thus be conferred on an organization on the basis of considerations such as its status in international law, its status under the domestic law of member states, its functions as set forth in its governing instruments, its corollary needs, and its relations with the executive branch of the federal government.

. . . . .

However, in the ordinary case it seems desirable for a court to follow any suggestion that the executive had made. The executive is better equipped to determine the functions and operating needs of the organization and the demands of United States foreign policy....

*Id.* at 1307–09 (citations omitted). Both the Salasses and the AMF have urged the 1958 Article in support of their positions—this is not surprising because it vacillates between the two positions. The Court agrees, however, with the author's conclusions, first, that absent clear language in the IOIA or legislative history thereof, the IOIA should not be read to preclude capacity for all organizations that are not designated thereunder and, second, that capacity can arise by reference to an entity's status under the domestic law of a member state.[10] This second point was

---

**10.** The concept is a familiar one in American law. F.R.Civ.Pro. 17 provides:

(b) Capacity to Sue or Be Sued.... *The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized.*

Although not directly applicable here, the Rule reflects the well accepted notion that an entity's legal viability is judged under the law of its domicile. *See, also, Carl Zeiss Stiftung,* 293 F.Supp. 892 (D.S.D.N.Y.1968) ("The legal existence, status, identity, and domicile of a foreign

addressed squarely in the English Proceedings.

### 4. Should this Court Give Comity to the Determination of the English Court that the AMF has a Juridical Personality under U.A.E. Law?

■ As noted above, an issue similar to that raised here was litigated at length in the English Proceedings.[11] The issue was decided in the end by the House of Lords, the highest judicial authority in the United Kingdom. The trial court found that the AMF was a *persona ficta* under U.A.E. law because of the passage by the U.A.E. of Federal Decree Number 35, relying in substantial part upon expert opinion given by Taj Elsir Hamza, legal advisor in the Ministry of Foreign Affairs in the U.A.E., and that, as such, it sufficiently "existed" in England to give it capacity to sue in the English municipal courts, notwithstanding its origin as a creature of treaty among sovereign Arab states. A split Court of Appeal disagreed, finding that, as an international organization not cognizable under English law, the AMF did not have capacity to sue in the English Courts and that Federal Decree Number 35 did not compel otherwise.

The matter thus went to the House of Lords. The result was again a split decision, with four of the law lords upholding the original trial court decision and one siding with the appellate court. The critical issue was whether "Federal Decree No. 35 only recognized an international organization [or created] a corporate body." *Arab Monetary Fund v. Hashim,* (H.L.(E.)), 1991 Reports at 160. By finding that it "created a corporate body", the House of Lords found that it had capacity and allowed the trial to continue.

The decision turned on whether the English courts should give comity to the law of the U.A.E., under which, as decided by the trial court, the AMF was an entity in the nature of a corporation—a *persona ficta* capable of suing and being sued. Ironically, the same issue is presented here: should this court give comity to the English courts' decision which itself was based upon giving comity to the laws of the U.A.E.

■ Comity is a well-established doctrine which is fundamentally identical under both English and American law. The United States Supreme Court has defined it as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). The Court of Appeal in the English Proceedings, referring to the *Shorter Oxford English Dictionary, 1st ed. (1933),* defined it as "[t]he courteous and friendly understanding by which each nation respects the laws and usages of every other, so far as may be without prejudice to its own rights and interests." *Arab Monetary Fund v. Hashim,* (no. 3) [1991] 2 A.C. 114, 136, C.A. Here, the English trial court found that, under U.A.E. law, the AMF was an entity in the nature of a corporation, with corresponding powers and duties. That court then gave comity to that law and allowed the suit to go forward in England. Under American law, this Court also should give similar comity to U.A.E., in the absence of "prejudice to its own rights and interests" and with due regard "to the rights of ... persons who are under the protection of its laws." However, it would be inappropriate to address that question anew here since it has already been extensively and thoroughly litigated in the United Kingdom. Therefore, this Court should give similar deference to the English courts' decision (particularly in view of the extensive appellate review) on the meaning of U.A.E. law, unless to do so would prejudice significant national interests of the United States or of those who are entitled to the protection of its laws. Since it would not, such deference will be given and the question of the juridical personality of the AMF under U.A.E. law

corporate entity or juristic personality, such as the Foundation here, must be determined by the laws of the country where it has been created and continues to exist.")

11. The moving parties were co-defendants of Dr. Hashim's, including the First National Bank of Chicago.

will be taken as having been conclusively decided by the English courts.

■ The Movants challenge this conclusion on two grounds. First, they argue that giving comity to the English decision would be contrary to the policies of the United States as expressed in its statutes, most particularly the IOIA. In light of this Court's having decided that the reach of the IOIA is not so pervasive, that objection fails. Second, they argue that the issues presented are not "identical" and therefore not entitled to the benefit of comity. This is not correct. The issue to which comity will be given effect is whether the AMF is a juridical person (a corporation, a *persona ficta*, an entity capable of legal battle) under U.A.E. law, not whether this means the AMF has capacity under English law.[12] Once this has been decided, capacity follows under American law as a matter of "customary law"[13].

### 5. Executive Power

■ Even if the AMF has capacity in a judicial sense, the issue must still be addressed in a political sense. As described above, the United States is subject to the Iran, Iraq and Libya Executive Orders. The impact, if any, that these orders have on the capacity on the AMF, however, is unclear.

As the Salasses argue:

It has long been established that only governments recognized by the United States and at peace with us are entitled to our courts, and that it is within the Executive Branch to determine which nations are entitled to sue.

*Pfizer Inc. v. Government of India*, 434 U.S. 308, 319–20, 98 S.Ct. 584, 591–92, 54 L.Ed.2d 563 (1978).

The English court in the Hashim case asked for and received input from the Executive branch of the English government. In this case, the Court asked the parties to investigate participation by the Executive branch regarding the capacity of the AMF.

The parties indicated in open court on June 28, 1995 that each had investigated Executive input and each had been advised that the State Department would decline to participate in these proceedings.

■ The Court is sensitive to the separation of powers in this Country and to the delicate political issues involved in granting privileges and immunities to an international organization. Undeniably the Court is without power to grant privileges and immunities, and this power remains with the Legislative and Executive branches of our government. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (hereinafter "*Sabbatino* "). In *Sabbatino*, the plaintiff was an instrumentality of the Cuban government. At the time of the case, President Eisenhower had exercised his authority under the Sugar Act of 1948, as amended on July 6, 1960, to reduce the sugar quota for Cuba; Cuba responded by alleging the United States' actions were an act of "aggression, for political purposes," and stating that it would impose its own restrictions on the sale of its sugar to entities owned or controlled by Americans. *Id.*, 376 U.S. at 402, 84 S.Ct. at 927. At the time of the case, the United States had officially severed all diplomatic relations with Cuba, and froze certain Cuban assets in the United States. In determining whether, in such an environment, an instrumentality of the Cuban government was entitled to bring suit in the courts of the United States, the Supreme Court explained as follows:

Although the severance of diplomatic relations is an overt act with objective significance in the dealings of sovereign states, we are unwilling to say that it should inevitably result in the withdrawal of the privilege of bringing suit.... Political recognition is exclusively a function of the Executive.... The view that the existing situation between the United States and Cuba should not lead to a denial of status to sue is buttressed by the circumstance that none of the acts of our Government

---

**12.** The fact that the determination of this issue is given comity should not be taken as indicative of whether any other issue decided in the. English proceedings will be given comity. That determination awaits another day.

**13.** *See,* footnote 10 and accompanying text.

have been aimed at closing the courts of this country to Cuba, and more particularly by the fact that the Government has come to the support of Cuba's 'act of state' claim in this very litigation.

*Id.,* 376 U.S. at 411, 84 S.Ct. at 931.

The debtors and Salasses argue that the Libyan and Iraq Executive Orders somehow impact upon the AMF's capacity to institute proceedings. The AMF, however, is not just comprised of Libya and Iraq. It has at least nineteen other members that, at least on this record, are not subject to restrictive Executive Orders. Moreover, the Executive Orders are not declarations of war and under the holding of *Sabbatino,* suits actually brought by instrumentalities of Libya and Iraq would not be precluded on the basis of the Executive Orders. However, the Libyan and Iraq Executive Orders may have impact at a later state of these proceedings. For example, if the AMF were eventually to receive a distribution from this estate, the potential of derivative distributions to Libya and Iraq would have to be analyzed in light of the Executive Orders.

The narrow issue regarding the legal capacity of an organization to bring a suit in this Country against its former President who now resides in this Country does not, this Court believes, present the same magnitude of political issues involved in a determination of whether such an organization is entitled to immunities or whether distributions on a judgment can be paid to Iraq or Libya. As noted above, the Executive branch has not participated in these proceedings; accordingly, this Court is without the guidance given the Supreme Court in the *Sabbatino* case. This Court finds, under these circumstances, that the Executive Orders do not indicate on the part of the Executive branch a decision to deny legal capacity to instrumentalities of Iraq or Libya or to organizations of which these two countries are members.

### 6. Does waiver, laches, or judicial estoppel prevent debtors from raising the capacity issue?

Because this Court has found that the AMF has legal capacity and stand-

ing in these cases, it is irrelevant whether the debtor has waived its right to argue these issues. The Court notes, however, that capacity is generally a defense that is waivable in litigation. *See,* Fed.R.Civ.Pro. 9(a) and *Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Development Corp.,* 933 F.2d 724 (9th Cir.1991) *citing Shaw v. Stutchman,* 105 Nev. 128, 771 P.2d 156, 159 (1989). On the facts of this case, however, this Court finds that the issue of the capacity of the AMF has *not* been waived by debtors; there has been established no sufficiently clear inference from their actions prior to the filing of this motion of their intent to do so. In addition, waiver would be inappropriate in this case. *See Sabbatino, supra,* 376 U.S. at 410, 84 S.Ct. at 930 (determining to consider issue of access to courts for first time at appellate stage because "[i]f the courts of this country should be closed to the government of a foreign state, the underlying reason is one of national policy transcending the interests of the parties to the action, ...."). Finally, neither laches nor judicial estoppel is applicable.

### IV. CONCLUSION

In sum, this court has subject matter jurisdiction pursuant to Section 1334 and personal jurisdiction over the AMF by consent. The AMF is a creditor with standing to participate in the case. Since the IOIA is not the exclusive source of legal capacity for international organizations, and in light of the AMF's status as a *persona ficta* under U.A.E. law with the attributes of a corporation, the AMF has legal capacity to appear in this Court.

Therefore, **IT IS ORDERED** denying the Motions and holding that the AMF has standing and legal capacity to participate in these bankruptcy proceedings and this Court has personal and subject matter jurisdiction over the AMF and its claims.